444 F.2d 824
 143 U.S.App.D.C. 366
 AMERICAN EXPORT-ISBRANDTSEN LINES, INC., et al., Petitioners,
v.
FEDERAL MARITIME COMMISSION and United States of America,
Respondents.
Empire State Highway Transportation Association, Inc.,
Middle Atlantic Conference, Intervenors.
 No. 22820.
 United States Court of Appeals, District of Columbia Circuit.
 Argued Dec. 4, 1969.
Decided June 11, 1970.
 
 Mr. Mark P. Schlefer, Washington, D.C., with whom Messrs. Joseph A. Byrne, New York City, and Stuart C. Law, Washington, D.C., were on the brief, for petitioners.
 Mr, Norman C. Barnett, Asst. Sol., Federal Maritime Commission, with whom Messrs. James L. Pimper, General Counsel, Kenneth H. Burns, Sol., Federal Maritime Commission, and Irwin A. Seibel, Attorney, Department of Justice, were on the brief, for respondents. Mr. H. B. Mutter, Asst. Sol., Federal Maritime Commission, also entered an appearance for respondents.
 Mr. Arthur Liberstein, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Mr. Joseph Rotwein, Washington, D.C., was on the brief, for intervenor, Empire State Highway Transportation Ass'n, Inc.
 Mr. Thomas M. Knebel, Washington, D.C., was on the brief, for intervenor, Middle Atlantic Conference.
 Before FAHY, Senior Circuit Judge, and TAMM and MacKINNON, Circuit judges.
 MacKINNON, Circuit Judge:
 
 
 1
 This case involves a truck Detention Rule[1] which the Federal Maritime Commission ('Commission') ordered inserted into the tariffs of the New York Terminals' Conference[2] (Terminals) in an attempt to relieve congestion at the wharves, piers and marine terminals in the area of the Port of New York. A shipping company, American Export-Isbrandtsen Lines, Inc. (Isbrandtsen) and other members of the New York Terminal Conference, petition this court to review a Federal Maritime Commission (Commission or FMC) order of February 25, 1969 directing the Terminals to include in their Truck Loading and Unloading Tariff a detention rule for motor vehicles. We have jurisdiction under 28 U.S.C. 2342(3) and 2349 and venue in the United States Court of Appeals for the District of Columbia Circuit is provided for by 28 U.S.C. 2343.
 
 
 2
 In a direct attack on New York pier congestion the Commission in October of 1963 ordered an investigation to determine whether certain provisions of a tariff filed by the marine terminals were in violation of the Shipping Act of 1916.[3] Of specific relevance was a provision in the Terminals' tariff providing:
 
 
 3
 'The Terminal Operator assumes no responsibility for delay to motor vehicles and no claims for such delay will be honored.' 9 F.M.C. 510 (Truck Tariff No. 6, Item 16)
 
 
 4
 After a full evidentiary hearing, the Commission in its Report and Order of May 12, 1966 (hereafter the 1966 Order) found it to be 'neither just nor reasonable' for the Terminals to disclaim liability for any truck detention,[4] and ordered the Terminals to insert in their Tariff No. 6 a 'reasonable detention rule * * * which will compensate the truckers for unusual truck delays caused by or under the control of the terminals.'
 
 
 5
 On January 18, 1968, we upheld this order in American Export-Isbrandtsen Lines, Inc. v. Federal Maritime Commission, 129 U.S.App.D.C. 1, 389 F.2d 962 (1968). Soon thereafter the staff of the Commission met with representatives of the Terminals and the trucking industry (Empire State Highway Trucking Association) in an attempt to reach agreement on a reasonable truck detention rule. Periodic meetings were held until August 21, 1968 but the parties were unable to agree, whereupon the staff of the Commission informed the parties that a memorandum would be forwarded recommending that the Commission prescribe a reasonable detention rule.
 
 
 6
 In late 1968, before the Commission was able to promulgate its rule, the Terminals submitted a detention rule amendment to its tariff providing inter alia:
 
 Truck free time will be as follows:[5]
 
 7
 Volume Free Time in Minutes
Less than 24,000 lbs. 240
24,000 lbs. and less than 36,000 lbs. 300
36,000 lbs. and more 360
 
 
 8
 The Terminals' detention rule further provided in Item 17(g)(3):
 
 
 9
 No truck detention will be allowed for delays or shutouts resulting from any of the following: (3) inadequate or insufficient manpower occasioned by the failure, refusal or lack of registered pier personnel in the area to fill work orders duly issued by the Participating Member (terminal) in accordance with regulations established by the Waterfront Commission of New York Harbor. In this connection, the official records of the Waterfront Commission will be conclusive on the issue of said availability of manpower.
 
 
 10
 Shortly thereafter, on September 27, 1968, the Commission entered an order rejecting the Terminals' proposed tariff amendment and, at the same time, published a proposed Detention Rule of its own along with an Order to the Terminals to Show Cause why the Commission's proposed Rule should not be adopted.
 
 
 11
 A full hearing was thereafter held and after considering the Terminals' response and the comments of all other parties, the Commission issued its order dated February 25, 1969 directing the Terminals to include in their tariffs a truck detention rule effective March 31, 1969, reading substantially in accordance with the rule originally proposed by the Commission in its Order to Show Cause.
 
 
 12
 In its order of February 25, 1969 directing that the Terminals include the proposed rule in its Tariff, the Commission stated:
 
 
 13
 The Conference misconceives the nature of the action taken here. Perhaps this misconception is partly due to our use of the word 'reject' in the show cause order. We recognize that the only Shipping Act provisions which specifically authorize the 'rejection' of tariff filings are section 2 of the Intercoastal Shipping Act, 1933, and section 18(b)(4) of the Shipping Act, 1916, and that these provisions do not apply to terminal operators. However, our action here was undertaken not under a specific statutory power to 'reject', but pursuant to the authority contained in section 17 of the Shipping Act, as a necessary step to implement and enforce our prior Report and Order in this proceeding. We previously determined that it was an unreasonable practice for the Conference to fail to adopt a reasonable tariff rule which would provide for compensation to truckers for delays incurred at the conference members' piers. Having found the practice unreasonable, we have now undertaken to determine, prescribe, and order enforced a reasonable tariff rule governing truck detention. Inherent in our authority to prescribe a reasonable rule or practice is the authority to set aside any rule or practice which would interfere with this authority. To conclude otherwise would give the Conference an absolute right to file and make effective any rule and thereby nullify our power to prescribe reasonable provisions. Such an interpretation of section 17 would abrogate an express grant of statutory authority and therefore would be plainly untenable.
 
 
 14
 We agree with the Commission's reasons for acting in the manner it did.
 
 
 15
 The material provisions of the Detention Rule as finally ordered to be effective March 31, 1969 by the Commission are set forth in an Appendix to this opinion.
 
 
 16
 Following the Commission's February 25, 1969 Order the Terminals requested this court to stay the operation of the rule until its legal validity could be determined. This request was denied; however we ordered all detention payments to be paid into an escrow account pending the determination of this case on appeal.
 
 
 17
 * Initially we consider whether the Commission acted properly in rejecting the detention rule proposed by the Terminals and in prescribing in its own rule that work slowdowns due to insufficient labor shall not excuse Terminals from the obligation to pay detention charges.
 
 
 18
 The law for centuries has recognized that public wharves, piers and marine terminals are affected with a public interest.[6]
 
 
 19
 These Terminals stand athwart the path of trade. A substantial part of all ocean-going export and import cargo that flows through the Port of New York passes over their piers. Efficiency of manpower, ships and vehicles is dependent upon the prompt handling of such cargo and determines whether the flow of interstate and foreign commerce is obstructed or facilitated. The public interest in their efficient operation is unquestioned. In the leading case of Munn v. Illinois, 94 U.S. 113, 24 L.Ed. 77 (1876), the Supreme Court in considering the status of grain elevators in Illinois that stood at the gateway of commerce, remarked:
 
 
 20
 'Property does become clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large. When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created. He may withdraw his grant by discontinuing the use; but, so long as he maintains the use, he must submit to the control.' 94 U.S. at 126, 24 L.Ed. 77.
 
 
 21
 Later an opinion by Chief Justice Taft upheld the constitutionality of the Packers and Stockyards Act, stating:
 
 
 22
 'The act, therefore, treats the various stockyards of the country as great national public utilities to promote the flow of commerce from the ranges and farms of the West to the consumers in the East. It assumes that they conduct a business affected by a public use of a national character and subject to national regulation. That it is a business within the power of regulation by legislative action needs no discussion. That has been settled since the case of Munn v. Illinois, 94 U.S. 113, 24 L.Ed. 77.' Stafford v. Wallace, 258 U.S. 495, 516, 42 S.Ct. 397, 402, 66 L.Ed. 735 (1922).
 
 
 23
 The Terminals here stand in the same relation to commerce as the grain elevators in Munn v. Illinois, supra, and the stockyards in Stafford v. Wallace, supra. They are a related service to public transportation, are charged with a public interest and are properly subject to the type of regulation here ordered in accordance with the Shipping Act of 1916.[7] Because of the vital importance of these Terminals to interstate and foreign commerce, Congress in the Shipping Act of 1916 provided for their regulation by the Federal Maritime Commission and authorized it to promulgate and enforce just and reasonable regulations and practices related to or connected with the receiving, handling, storing, or delivering of property at harbor terminal facilities. U.S.Const. art. I, 8, cl. 3 (the Commerce Power); Shipping Act 1916, 1, 17, 18, 46 U.S.C. 801, 816, 817;[8] California v. United States, 320 U.S. 577, 64 S.Ct. 352, 88 L.Ed. 322 (1944); American Export-Isbrandtsen Lines v. Federal Maritime Commission, supra.
 
 
 24
 The power thus conferred is equivalent to that recognized in Munn and Stafford and is to be used for the purpose of facilitating the free flow of commerce by guaranteeing an efficient terminal system. One cause of unusual delay of motor vehicles at the terminals is the lack of promptness in spotting trucks so they can load and unload cargo. The right to assess charges for undue detention existed at common law. Detention charges have a double purpose, one of which is to a car, ship or vehicle. for the use of a car, ship or vehicle. The other is to promote efficiency in the operation. Turner, Dennis & Lowry Lumber Co. v. C., M. & St. P. Ry., 271 U.S. 259, 262, 46 S.Ct. 530, 70 L.Ed. 934 (1926).[9] Here the Commission has ordered a detention rule with respect to truck delay caused by the Terminals. In ordering its own rule the Commission rejected the Terminals' rule. Obviously, the power conferred on the Commission by section 17 of the Shipping Act implies the power to reject a detention rule it finds to be an unjust and unreasonable practice.
 
 
 25
 However, the Terminals contend that the rule they (the Terminals) proposed was not an unjust or unreasonable practice and that it complied with the Commission's order to formulate a 'reasonable' detention rule making the Terminals liable for 'unusual truck delays caused by or under the control of the terminals.'[10] Therefore, they assert that the Commission improperly rejected their proposed rule and exceeded its power by prescribing the rule which makes the Terminals liable for detention caused by factors allegedly beyond their control, to wit: detention attributable to insufficient labor.[11] We disagree.
 
 
 26
 [5,6] We find no inconsistency between the Commission's 1966 order and the Commission's rule. The Terminals' argument in this respect is based on a strained construction of the Commission's 1966 order and what it intended. The Commission's intent in that order is ascertainable from its terms and from the hearing record it had before it. From that record and the Examiner's decision thereon it appeared that 'insufficient labor' as a cause for pier delay was considered to be attributable to the Terminals since the Examiner's decision stated:
 
 
 27
 'The Terminals cause delay, insufficient labor and/or equipment being an example. Also, inadequate control of labor results in delay. The record is replete with specific allegations and counter-allegations concerning the delay of trucks at the piers.' 6 Pike & Fischer Shipping Regulation Reporter 138, 161.
 
 
 28
 Hence, since the 1966 order was largely based on the hearing, the order cannot be interpreted to attribute to the Commission an intent to direct the Terminals to establish a rule exempting them from a responsibility for delays for which the hearing showed they were responsible and which they are now required to assume. In fact, just the contrary is true. The Commission relying in part on the Examiner's decision considered that delays due to labor shortages were the responsibility of the Terminals. So quite apart from their order being intended as a direction to exclude responsibility for such delays from the Rule, it was a direction to the Terminals to incorporate a rule assuming liability for delays due to insufficient labor. Judge Wright's earlier decision also recognizes that the 'piers are under (the) * * * direct authority and control'[12] of the terminal operators. So much for the 1966 order.
 
 
 29
 But the real question is not whether the order promulgating the Detention Rule is inconsistent with the 1966 order but whether it is a just and reasonable practice for the Terminals to be made responsible, to the extent that the Rule makes them responsible, for delays due to insufficient or inefficient labor when we consider the labor situation that exists at the piers, being as it is, heavily affected by the policies of the New York Waterfront Commission.
 
 
 30
 We recognize that the Terminals cannot completely control the policies of the Waterfront Commission or the collective bargaining contract (what employer can?) but these factors are not beyond their influence and, along with the availability of labor, may be taken into consideration in the free time schedules prescribed by the Commission.
 
 
 31
 By filing tariffs[13] the Terminals hold themselves out to furnish cargo handling services at the public terminals in the Port of New York.[14] The Terminals thereby voluntarily assumed the responsibility for having sufficient labor available for the efficient discharge of the services they have voluntarily undertaken to provide. Furthermore, the Commission's Rule does not wholly ignore the Terminals' labor problem. It recognizes the impact of possible labor shortages in allowing substantially more free time for servicing trucks than is required on the average, and to this can be added the fact that the tariff rates set by the Conference and approved by the Commission, with antitrust immunity, can compensate for detention penalties the Terminals may be required to pay.
 
 
 32
 In considering this issue we must also recognize that we are dealing with a detention rule, which is much the same as demurrage. Such rules are designed to operate on the average as it is obviously impractical to have an adjudicatory hearing over the trivia involved in each truck delay. Thus, the reasonableness of such rules is to be found in their over-all operation. This brings us to the free time schedules.
 
 
 33
 One basis upon which the Commission rejected the Terminals' Detention Rule was that it found its free time provisions to be unreasonable in allowing as much free time to service a 2,000 pound load as for one of 24,000 pounds. In this connection, the extent of the unreasonableness of this feature of the Terminals' Detention Rule is evident when one considers that 50% Of the trucks carrying export cargos to the piers carry less than 2,000 pounds a trip. The Terminals' rule, thus, in beginning its free time schedule at 24,000 pounds, did not adequately consider or provide for a very substantial portion of the truck traffic serviced by the Terminals. Because of this failure we decide that this alone was an adequate basis to reject the Terminals' rule in favor of one that did. The difference between the two rules in this respect adequately spells out the unreasonableness of the Terminals' rule.
 
 
 34
 In support of their proposed rule the Terminals also contend that the Interstate Commerce Commission found such a detention rule as proposed by the Terminals to be reasonable in Detention of Motor Vehicles-- Middle Atlantic and New England Territory, 318 I.C.C. 593, 611 (1962)[15] and that it would not have done so had it considered that failure to provide less time for lighter loads was inherently unreasonable. Actually such argument proves nothing in this case because, among other reasons, there are substantial differences between the two rules and in the circumstances in which they operate.
 
 
 35
 First, the ICC Rule as first adopted only applied when carriers' vehicles were 'detained at the premises of the consignor or consignee.' Initially it only applied to terminals if they were the consignor or consigness. (This was modified in 1965 to also apply to other places designated by consignors or consignees.) On the other hand, the rule we are interested in applies only to terminals. Handling cargo at a terminal and at the premises of a consignor or consignee is not the same thing.
 
 
 36
 Secondly, the ICC Rule only applies to vehicles which were 'ordered or used to transport shipments subject to truck load rates.' (325 I.C.C. 366). This brings us to the differences in the type of traffic covered by the two rules and it is obvious that the ICC Rule is more concerned with trucks that carry larger loads. The 'truck load rate' partially illustrates this. It is also evident from the ICC One Year Study of an 'acceptable sample' of trucking operations under their original rule, with respect to which the Examiner reported that out of the 4,010 vehicles included, '3,594 had shipments weighing 12,000 pounds or more. * * *' (325 I.C.C. 352). Contrast this with the previously noted fact that more than 50% Of the trucks carrying export cargo to the marine Terminals here carry less than 2,000 pounds per trip. These two statistics are not completely comparable but they do demonstrate that the truck operations covered by the two rules are sufficiently different so that the free time schedules could not be interchanged in the manner attempted by the Terminals. These differences in the nature of the two operations also answer the Terminals' contention that the ICC Rule can be relied upon as an expression by the ICC that 'a failure to provide less free time for lighter loads was (not) inherently unreasonable.' It cannot be so treated because the portion of the ICC free time Rule that the Terminals proposed to adopt applied only to trucks 'ordered or used to transport shipments subject to truckload rates,' i.e., 12,000 pounds or more. (325 I.C.C. 367). Thus, smaller loads were not a material part of the truck traffic covered by the ICC Rule and in framing a rule designed to perate on the average there was no necessity for the ICC to cover such smaller loads. Therefore the ICC failure to deal with smaller loads in the free time schedule which the Terminals sought to copy from the tariff is explained on other grounds.[16] It was thus proper for the Commission to reject the free time schedule which the Terminals sought to copy from the ICC Rule because there was no evidence that the servicing of vehicles at the premises of the consignors and consignees served by the motor carriers under the ICC tariff was performed under comparable conditions to those serviced by the Terminals in the Port of New York.
 
 
 37
 We also note that the Terminals took their proposed free times from column A of the ICC Detention Rule which applied only to truck load rates. However, the ICC Rule also has a column B. which is applicable to the last vehicle used in transporting overflow truckload (TL) shipments requiring two or more vehicles, or to vehicles containing TL shipments stopped for completion or loading or partial unloading. In the free time allowances for such shipments the ICC tariff (column B) deals with loads of weights similar to those in the instant rule, i.e., under 24,000 pounds. The following table compares the ICC free time rates (325 I.C.C. 367) with those in the Detention Rule here proposed by the Commission (FMC). Those free times indicated in the ICC column for loads under 24,000 pounds are from column B of the ICC tariff described above (325 I.C.C. 367).
 
 Comparative Free Time Schedules in Minutes
 
 38
 (A) (B) (C) (D)
 ICC FMC FMC
Actual weight in pounds All trucks Non-appointment Appointment
 per vehicle (325 I.C.C. 367) trucks trucks
 2,000 pounds or less 90B not applicable 120
 2,001 to 5,000 90B 165 135
 5,001 to 9,999 90B 195 165
10,001 to 15,000 180B 225 195
15,001 to 19,999 180B 255 225
20,000 to 23,999 240B 285 255
24,000 to 25,000 300** 285* 255*
25,001 to 30,000 300** 300 270*
30,001 to 35,000 300** 330 300
35,001 to 35,999 300** 360 330
36,000 to 40,000 360** 390 330*
 over 40,000 360** 390 360* When Federal Maritime Commission (FMC) is less liberal.** The column B times for loads of 24,000 and over were the same as the
 column A times for loads of the same weight.
 (B) From Column B of ICC Detention Rule. 325 I.C.C. 367.
 
 
 39
 From this comparison it is obvious that the ICC free time schedule for such loads under 24,000 pounds is much less generous than the free time prescribed here by the Commission. And while the class of shipments is not entirely comparable it is not without significance that the free time allowed in the ICC tariff for shipments of 24,000 pounds and over were the same for both column A and column B shipments. It is also significant that the free time allowances in the Commission's Rule for loads of 24,000 pounds and over compared favorably with those prescribed by the ICC Rule. In fact, in eight weight groups above 24,000 pounds the Commission schedule was more liberal than the ICC allowances, while in four weight groups the ICC allowances were more liberal. (See comparison schedule.)
 
 
 40
 The Commission also points out that the ICC subsequently amended its rule to provide for a shorter period of detention in the New York Short Haul Area. We agree with the Terminals' argument that this is not a controlling factor, but it is not completely without significance.
 
 
 41
 We then come to consider how unusual delay at the pier should be dealt with. The Terminals contend that they 'literally' followed the Commission's order, and the court's opinion sustaining the order, to prescribe a detention rule assuming responsibility for 'unusual truck delays caused by or under the control of the terminal' by incorporating those exact words in Item 17 of their tariff, as follows:
 
 
 42
 Charges for motor vehicles ('truck') delay will be incurred by the Participating Member (terminal operator) for unusual truck delays caused by or under the control of the Participating Member and in conformity with the provisions of this item. But this is an example of where the 'letter of the law killeth.' It is true, as can be seen by reading Item 17, that the Terminals did adopt the specific clause in their rule, but then, in the additional provisions establishing the necessary standards for implementing the rule, they implicitly incorporated a construction of the Commission's directive that was diametrically opposite to what the Commission intended. So the Terminals did lip service to the order of the Commission but completely violated its spirit. They killed it by definition. In this manner the Terminals turned a directive to assume liability for delays for which they were responsible into a device to evade liability in wide areas of their true responsibility and thus almost completely frustrated the intent of the Commission's order.
 
 
 43
 In rejecting the Terminals' rule the Commission pointed first to the provision exempting the Terminals for delay caused by 'inadequate or insufficient manpower.'[17] This was considered to be objectionable because it excused the Terminals from responsibility for delays occasioned by its 'failure or inability to obtain labor.'
 
 
 44
 Next, the Commission objected to the Terminals' free time schedule which allowed four hours' free time for trucks with loads under 24,000 pounds; five hours' free time for loads running from 24,000 pounds to 36,000 pounds; and six hours' free time for loads of 36,000 pounds and more. The criticism being that four hours is too much free time for the smallest shipments and that the rule failed to recognize that less time is required to handle a 'shipment of 2,000 pounds * * * than one of 24,000 pounds.' These objections went to the very heart of the Terminals' Rule.
 
 
 45
 We find that the Commission's objections were well taken and that they were fully justified in finding the rule to be unjust and unreasonable because of these objectionable provisions. The Terminals suggest that the Commission could not reject the rule just because of these two provisions; but we find that these two provisions were such an important part of the rule, that they so colored its entire workings and they were so antagonistic to the true intent and spirit of the Commission's order, that the Commission was fully justified because of these two provisions in rejecting the rule in its entirety and promulgating its own rule.
 
 
 46
 After consideration of the foregoing we submit that the proper approach to solve the detention problem is not to follow the Terminals' procedure of trying to define the word 'control' as used in the 1966 Order and then determine whether, according to that definition, labor shortages are one of the causes of congestion and delay in New York Harbor terminals. Instead, we should determine whether it is just and reasonable to hold the Terminals responsible for unusual usual truck delays. If it is, it necessarily follows that delays due to labor shortages are properly chargeable to the Terminals as being within their assumed responsibilities.
 
 
 47
 To this end we summarize some of the considerations behind the Commission's proposed detention rule.
 
 
 48
 First: For many years congestion at the New York Harbor terminals has been a major problem to those charged with the duty of protecting the public interest in the efficient flow of commerce.
 
 
 49
 Second: After a full hearing,
 
 
 50
 'The Examiner concluded that irrespective of the causes of delay the 'TRUCKMEN HAVE A RIGHT TO EXPECT HANDLING as expeditiously as possible, and they have a right to get better handling than they have had in many specific cases." 9 FMC 505 (1966).
 
 Third: The Examiner's decision also noted:
 
 51
 'The terminals cause delay, insufficient labor and/or equipment being an example. The record is replete with specific allegations and counter-allegations concerning the delay of trucks at the piers.' 6 Pike & Fischer Shipping Regulation Reporter 138, 161.
 
 
 52
 Fourth: The Terminals are affected with a public interest and hold themselves out to the public as furnishing a service which consists, in part, of receiving, handling, unloading and delivering shipments of goods at waterfront terminals.
 
 
 53
 Fifth: Detention payments, like demurrage, have a dual purpose. They compensate for the loss of use of equipment and operate as a deterrent against its inefficient use due to unreasonable detention. Thus a proper detention rule by expediting the servicing of carriers at the terminals, decreases the cost of handling freight, facilitates the flow of commerce and benefits the general public.
 
 
 54
 Sixth: At New York Harbor, the number of longshoremen available to the Terminals is restricted by law. Terminals are prohibited by law from employing anyone as a longshoreman who is not on the register of the Waterfront Commission. Since 1965 the register has been virtually closed and a sharp decline in available labor has occurred. The register is subject to being opened, however. Recently, the New York Shipping Association, of which four of the petitioners are voting members and all of the Terminals are at least associate members, opposed an attempt to reopen the register and add more employees.[18] The New York Shipping Association is the collective bargaining agent of management. Collective bargaining agreements are critical to the whole picture when dealing with the status of the register but the Terminals' experience thereunder does not indicate that sufficient labor is not available to handle the required shipments within the liberal free time allowances prescribed in the Commission's schedule. We consider the record here indicates that labor may be a difficult problem but not an impossible one. Despite the protestations the Terminals' business does have an anticipatory and limiting character since all cargo is related to vessels that are arriving and departing from particular piers.
 
 
 55
 Seventh: Disputes would be endless if the tariff made the Terminals liable for unusual delays resulting from 'inadequate control' of labor and excused the Terminals where the delay was attributable to the 'insufficient supply' of labor. The burden of proof would be on the trucker to pinpoint the cause for delay. As the Terminals pointed out at oral argument, there is hardly a day goes by that some requests for workers are not filled. The burden of proof thus placed on hte truckers by such a rule would make its working difficult and the purposes intended to be served by a detention rule would not be accomplished. It is the Terminals that must be charged with the duty of providing the labor necessary to carry out the service which they undertake in their tariffs to furnish to the public.
 
 
 56
 Viewed in this light, it is apparent that the Commission properly determined that the responsibility for labor shortages came within that range of activities properly determined to be within the Terminals' responsibility. So, considering all these factors and recognizing the special knowledge, experience and ability of the Commission to deal with these Terminal problems, which the statute has made their special responsibility, we find that the Commission acted properly in rejecting the Terminals' proposed detention rule in its entirety,[19] that its stated reasons for so doing fully justified the action taken, and that the detention rule, as ordered by the Commission is a just and reasonable exercise of the power of regulation in the public interest. Businesses affected with a public interest and subject to governmental regulation may be required by the regulatory agency to improve their service even though some added expense may result. Missouri Pacific Ry. v. Kansas, 216 U.S. 262, 278, 30 S.Ct. 330, 54 L.Ed. 472 (1910); Atlantic Coast Line R.R. v. North Carolina Corp. Comm.,206 U.S. 1, 24-27, 27 S.Ct. 585, 51 L.Ed. 933 (1907); Wisconsin M. & P.R.R. v. Jacobson, 179 U.S. 287, 301-302, 21 S.Ct. 115, 45 L.Ed. 194 (1900).
 
 II
 
 57
 We next consider the Terminals' contention that it is unlawful for the Commission to require them to pay truck detention charges for motor vehicles which are unloaded by the operator of the truck at the terminals.
 
 
 58
 This involves the Commission's Order directing the detention rule to include, inter alia, the following provision:
 
 
 59
 Sec. 4(c) Motor vehicles unloaded by the operator of such vehicles will be entitled to detention charges if not spotted at a place convenient for unloading within 120 minutes after proper documentation. No detention will be allowed once such vehicles are spotted convenient for unloading.
 
 
 60
 The Terminals contend they are required by this provision of the rule 'to pay truck detention even though it (the Terminal) performs no service and receives no revenue,' but this is not entirely a correct statement. The Terminals do perform a service and they do receive revenue. In their own words they are 'operators of piers and marine terminals.' In this capacity they receive cargo for the steamship companies, spot the vehicles and assign men and equipment to receive the shipment. This is the function of 'receiving' as referred to in the Shipping Act, 1916 (46 U.S.C. 816). When this duty is not promptly carried out they are liable for delay. It is immaterial that they do not unload the truck. The detention charge is made because they have caused delay and section 4(c) of the rule provides that the Terminals are liable for detention only if they fail to spot a truck at a place convenient for unloading within 120 minutes. The Terminals are also liable for detention with respect to vehicles that they unload if they are not 'completely serviced' (section 4(a)) within the designated free time schedule. Thus, when delay occurs in either instance, the Terminal is responsible in accordance with the rule. It is thus immaterial that the Terminals do not receive a direct payment for unloading some trucks. Their function as a public terminal includes services other than 'unloading.' These are specified in the Shipping Act and include: 'receiving, handling, storing and delivering' cargo. The fact that they do not unload a truck does not mean that they do not furnish services with respect to that cargo, but detention payments are not based on whether a person makes a payment for a service but upon whether the person by his acts or by his failure to act can be said to be responsible for unusual delay in the servicing of trucks at their Terminal. Since the Terminals furnish essential services to goods in commerce it is within the statutory power of the Commission to establish certain procedures and penalties that are reasonably designed to implement the free flow of trade and commerce. The detention rule in question as fashioned by the Commission is such a rule.
 
 
 61
 The terminals further contend that this provision of the rule is inconsistent with those instances where they unload containers for the steamship companies without a fee and for which the Commission does not impose liability for delays.[20] The container analogy is inapposite, however. The Terminals perform this service pursuant to contracts with the shipping companies.[21] After World War II the domestic shipping industry was nearly extinct. Many authorities and businessmen saw a coordinated container system as the principal means of saving the industry. The contracts between the shippers and the terminals were negotiated for the purpose of encouraging container service.[22]
 
 
 62
 There is also a very substantial difference between the number of driver unloaded trucks and container shipments. According to the Terminals' brief, at least 85% To 90% Of export cargo is derived from 'trucks unloaded by drivers without use of terminal personnel.' With driver unloaded trucks constituting such a large portion of the operation, and the remainder being split between (a) trucks unloaded by the Terminals and (b) container traffic, it is obvious that container traffic is not by any means the same substantial problem as driver unloaded trucks. Thus, in addition to the difference in the form of the service, there is also a very substantial difference in hte magnitude of the problem, if any. In such circumstances it is entirely reasonable for the Commission to deal with what it considered to be the major problem, i.e., preventing discrimination against driver unloaded trucks of which there are a great many; and not requiring in this tariff that the Terminals pay detention for container traffic which they handle in a different capacity, i.e., directly as agents for the steamship companies. In the event it develops that substantial delays result with respect to the handling of container cargo, the rule can always be amended or a separate rule promulgated.
 
 
 63
 It is also contended by the Terminals that there is no evidence to support a conclusion that there is any danger of their discriminating against driver unloaded trucks. We conclude, however, in view of the magnitude of the potential problem of driver unloaded trucks, representing as they do 85% To 90% Of all export cargo, that the Commission was well advised to insert section 4(c) in the detention rule. If servicing of driver unloaded trucks could be held up indefinitely in such large numbers it is hard to see how the congestion situation would be improved. In this respect the Commission applied its expert knowledge of the workings of the industry by taking steps in advance to plug what could otherwise have turned out to be a substantial loophole. We consider it obvious that the absence of this provision could well destroy a substantial portion of the beneficial effects the rule sought to accomplish. Section 4(a) serves to insure that the whole rule will be more workable and is not required to be supported by a showing of substantial evidence at an adversary hearing. It is sufficient that it is an integral provision of a reasonable rule. We thus conclude that section 4(b) (containers) and section 4(c) (driver unloaded trucks) of the rule, for the reasons stated above, are both just and reasonable.
 
 III
 
 64
 Finally we consider whether that portion of the Commission's rule is just and reasonable which provides that the amount of free time allowed for each truck be determined by reference to a sliding scale varying with the weight of the load. The Terminals contend that the Commission's Detention Rule is unreasonable in so providing because it takes just about as long to unload a small load of 5,000 pounds, for example, as it does to unload one of 24,000 pounds. Some evidence to that effect was introduced at the hearing. Actually, whether it does or not depends upon the character of the cargo. In some instances the number of pieces more than the weight thereof may determine the time necessarily required to be consumed in loading or unloading. Other factors that affect handling time may be the type of packaging, the weight density and the method of loading or unloading, whether by hand or by machine; but on freight of average density and weight we recognize it to be the sounder and more logical conclusion that there is a direct relation between weight and handling time. Studies of average time consumed necessarily reflect all factors. It is basic knowledge of this character that we recognize to be within the special competency of the Commission. We also note Detention of Motor Vehicles-- Middle Atlantic and New England Territory, 318 I.C.C. 593, 606 (1962), which is much relied upon by the Teminals, where the Interstate Commerce Commission expressed itself similarly:
 
 
 65
 'It is conceded that in many instances the number of pieces constituting a shipment will have more effect on time consumed in loading or unloading than the total weight, but on freight of average density and weight the conference believes that there is a direct relation between weight and time. In any case, where varying free time is to be permitted, the problem is to select the most equitable basis for the variation, and it would appear that generally weight is the proper basis.' 318 I.C.C. 606.
 
 
 66
 To the same effect is Detention of Motor Vehicles-- Middle Atlantic and New England Territory, 325 I.C.C. 336, 352.
 
 
 67
 We conclude that it is just and reasonable for the Commission to base the free time schedule on a sliding scale varying with the weight of the load.
 
 
 68
 Affirmed.
 
 APPENDIX
 Federal Maritime Commission
 Docket No. 1153
 
 69
 TRUCK AND LIGHTER LOADING AND UNLOADING PRACTICES AT NEW YORK HARBOR
 
 Order
 
 70
 Therefore, It Is Ordered, pursuant to section 17 of the Shipping Act, 1916, That the New York Terminal Conference include in its Truck Loading and Unloading Tariff No. 7, FMC-T No. 8, a Truck Detention rule reading as follows:
 
 Vehicle Detention Rules
 Section 1-- General Provisions
 
 71
 Motor vehicles loading or unloading waterborne freight at piers or marine terminals of members of the New York Terminal Conference shall be entitled to receive detention charges[23] for delays occasioned at piers beyond the time set forth in section 4. Detention charges shall accrue in instances where the delays result through no disability, fault, or negligence on the part of the motor vehicle.
 
 
 72
 No detention will be allowed for delays or shut-outs resulting from strikes or work stoppages. In such cases, it is expected that the terminal operator will attempt to inform all potential users of the pier by telephone or advertisement. * * *
 
 
 73
 No detention will be allowed for delays resulting from severe or unusual weather conditions. * * *
 
 
 74
 Work slowdowns due to insufficient labor shall not excuse the responsibility of the terminal operator under this rule.
 
 Section 2-- Documentation
 
 75
 Detention time does not begin to run until shipping documents[24] required by the terminal operator for release or delivery of cargo are found to be complete. * * * The terminal operator shall determine whether documentation is adequate and may refuse to handle motor vehicles without full and proper documentation. * * *
 
 Section 3-- Computation of Time
 
 76
 Time for detention purposes shall commence when the vehicle has completed documentation as provided in section 2.
 
 
 77
 Detention will accrue during the regular business hours of the terminal, or additional hours if established by the terminal operator or steamship operator, provided the vehicle obtains a pass and has completed documentation as required by section 2 prior to 3 o'clock, p.m.
 
 
 78
 The lunch period as set forth in the labor contract, but not exceeding one hour, shall not be included in calculating time or detention.
 
 Section 4-- Time
 
 79
 (a) When vehicles are loaded or unloaded within the time periods set forth below, there will be no detention charges paid. Vehicles designated will be entitled to detention charges if not completely serviced within the designated time periods on the following basis.
 
 
 80
 1) Non-Appointment Trucks
 2000 pounds or less Not applicable*
 2001 to 5000 pounds 165 minutes
 5001 to 10000 pounds 195 minutes
 10001 to 15000 pounds 225 minutes
 15001 to 20000 pounds 255 minutes
 20001 to 25000 pounds 285 minutes
 25001 to 30000 pounds 300 minutes
 30001 to 35000 pounds 330 minutes
 35001 to 40000 pounds 360 minutes
 over 40000 pounds------------------------ 390 minutes
2) Appointment Trucks
 2000 pounds or less 120 minutes
 2001 to 5000 pounds 135 minutes
 5001 to 10000 pounds 165 minutes
 10001 to 15000 pounds 195 minutes
 15001 to 20000 pounds 225 minutes
 20001 to 25000 pounds 255 minutes
 25001 to 30000 pounds 270 minutes
 30001 to 35000 pounds 300 minutes
 35001 to 40000 pounds 330 minutes
 over 40000 pounds------------------------ 360 minutes
 
 
 
 *
 Non-appointment vehicles with shipments of 2000 pounds or less shall not
 
 
 
 81
 be entitled to detention charges.
 
 
 82
 b) Containers handled as a single unit will be allowed 120 minutes, regardless of weight, before detention charges accrue.
 
 
 83
 (c) Motor vehicles unloaded by the operator of such vehicles will be entitled to detention charges if not spotted at a place convenient for unloading within 120 minutes after proper documentation. No detention will be allowed once such vehicles are spotted convenient for unloading.
 
 
 84
 (d) No detention will be paid when sorting or selection is requested or required by the motor carrier. The terminal operator is not absolved from liability under this rule when sorting or selection is done for his convenience.
 
 Section 5-- Charges
 
 85
 When the loading or unloading of freight is delayed beyond the time allowed in section 4, the vehicle shall apply to the terminal operator for detention charges and shall be entitled to $3 for each 15-minute period beyond the time designed in section 4.
 
 
 86
 It is Further Ordered, That this order become effective March 31, 1969.
 
 
 
 [1]
 The Detention Rule here provides for the imposition of charges for delaying the loading or unloading of motor vehicles beyond stated periods of time. Such detention charges are similar to demurrage which are rules in respect to the use of ships and railroad cars. Their purpose is to promote efficiency. See Iversen v. United States, 63 F.Supp. 1001, 1004-1005, aff'd, 327 U.S. 767, 66 S.Ct. 825, 90 L.Ed. 998, rehearing denied, 327 U.S. 819, 66 S.Ct. 963, 90 L.Ed. 1041 (1946)
 
 
 [2]
 The New York Terminal Conference is an association of steamship companies and stevedores operating piers at the port of New York. (318 I.C.C. 600)
 
 
 [3]
 46 U.S.C. 801 et seq. See note 8 infra for section 17
 
 
 [4]
 Truck and Lighter Loading and Unloading Practices at New York Harbor, 9 F.M.C. 505, 515 (1966)
 
 
 [5]
 Free time would be computed from the time the truck arrives at the terminal, has its documents cleared and stamped
 
 
 [6]
 Lord Chief Justice Hale (1609-1676) in one of his famous treatises, De Portibus Maris, pointed out that duties imposed for cranage, wharfage, pesage, &c of a public wharf, were required to be reasonable and moderate because the 'wharf and crane and other conveniences are affected with a public interest, and they cease to be juris privati only; as if a man set out a street in a new building on his own land, it is now no longer bare private interest, but is affected with a public interest.' 1 Hargrave, Tracts 77-78
 
 
 [7]
 Welch, Public Utility Regulation, 1-2
 
 
 [8]
 Section 17 of the Shipping Act of 1916 provides:
 'Every such carrier and every other person subject to his chapter shall establish, observe, and enforce just and reasonable regulations and practices relating to or connected with the receiving, handling, storing, or delivering of property. Whenever the Board finds that any such regulation or practice is unjust or unreasonable it may determine, prescribe, and order enforced a just and reasonable regulation or practice.' 46 U.S.C. 816. Section 1 of the Shipping Act of 1916 defines 'other person subject to this Chapter' as 'Any person not included in the term 'common carrier by water,' carrying on the business of forwarding or furnishing wharfage, dock, warehouse, or other terminal facilities in connection with a common carrier by water.: 46 U.S.C. 801.
 
 
 [9]
 We also note that the Terminals have imposed their own demurrage charge for delay by shippers in removing cargo from their piers
 
 
 [10]
 Truck & Lighter Loading & Unloading, 9 F.M.C. 505, 515 (1966)
 
 
 [11]
 Isbrandtsen and other Participating Carriers under their tariffs assess demurrage charges on cargo not carried in containers remaining on piers after expiration of free time against consignees in certain instances, i.e.:
 (b) Where a consignee is prevented from removing his cargo by factors beyond his control (such as, but not limited to, longshoreman strikes, trucking strikes, or weather conditions) which affect an entire port area or a substantial portion thereof, and when a consignee is prevented from removing his cargo by a longshoreman's strke which affects only one pier or less than a substantial portion of the port area, carrier shall (after expiration of free time) assess all demurrage against imports at the rate applicable to the first demurrage period, for such time as such inability to remove the cargo may continue. * * *
 (a) In the event application for delivery demurrage is:
 (a) in the event application for delivery of cargo is made after the expiration of free time and the carrier is for any reason (including a longshoreman's strike) unable, or refuses, to tender cargo for delivery, first period demurrage shall be charged for the duration of the carrier's disability or refusal.
 As official documents on file with the Commission, the tariffs of Isbrandtsen and other Participating Carriers are within the judicial knowledge of the court. 9 J. Wigmore, Evidence 2568a (3d ed. 1940). The extracts above are from the North Atlantic Westbound Freight Association Tariff (F.M.C. No. 28), effective date 1st January 1970. Isbrandtsen is a participating carrier.
 
 
 [12]
 American Export-Isbrandtsen Lines v. Federal Maritime Commission, supra at 964
 
 
 [13]
 Tariff No. 7, New York Terminal Conference
 
 
 [14]
 In this respect they are the same as carriers, Minneapolis & St. L. Ry. Co. v. Pacific Gamble Robinson Co., 215 F.2d 126 (8th Cir. 1954)
 
 
 [15]
 The New York Terminal Conference (the Terminals here) in the Interstate Commerce Commission proceedings opposed the application of the ICC Rule to trucks carrying cargo to and from ocean piers on the ground that the Federal Maritime Commission regulates ocean piers and that the delivery of freight by trucks at the ocean piers was distinguishable from the delivery of freight to the consignors and consignees generally serviced by the trucks covered by the ICC Rule (318 I.C.C. 593, 606 (1962)). We agree
 
 
 [16]
 'Comparisons * * * are of little value unless all the elements that enter into the problem are presented.' Smyth v. Ames, 169 U.S. 466, 540, 18 S.Ct. 418, 431, 42 L.Ed. 819 (1898)
 
 
 [17]
 Item 17(G) provides in pertinent part: 'No truck detention will be allowed for delays or shutouts resulting from any of the following:
 '(3) inadequate or insufficient manpower occasioned by the failure, refusal or lack of registered pier personnel in the area to fill work orders duly issued by the Participating Member in accordance with regulations established by the Waterfront Commission of New York Harbor. In this connection, the official records of the Waterfront Commission will be conclusive on the issue of said availability of manpower.'
 
 
 [18]
 10 Pike & Fischer Shipping Regulation Reporter 891
 
 
 [19]
 The Terminals did not comply with the 1966 Order and Arizona Grocery v. Atchison T. & S.F. Ry., 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348 (1932) is accordingly not applicable
 
 
 [20]
 The Rule however does provide:
 Sec. 4(b) Containers handled as a single unit will be allowed 120 minutes, regardless of weight before detention charges accrue.
 
 
 [21]
 It is also noted that the demurrage provisions of the Carriers 1970 Tariff do not apply to container cargo. See note 11, supra
 
 
 [22]
 21 Stan.L.Rev. 1077 (1969); 18 Catholic U.L.Rev. 417 (1969); 33 ICC Prac. J. 27 (1965); 32 ICC Prac.J. 872 (1965); 31 ICC Prac.J. 803 (1964); 28 ICC Prac.J. 185 (1960)
 
 
 [23]
 Detention charge as used in this rule means compensation to be paid by marine terminal operators to motor truck companies for delays of motor vehicles at marine terminal facilities
 
 
 [24]
 Shipping documents as used in this rule generally include, but are not necessarily limited to, the carriers' release, dock delivery order, dock receipt, weighing receipt, carrier certificate, container survey form, and other documents and/or notations required by Government authority, port customs, or trade association