FEDERAL MARITIME COMMISSION ET AL. *v.*
AKTIEBOLAGET SVENSKA AMERIKA
LINIEN (SWEDISH AMERICAN
LINE) ET AL.

No. 257.   Argued January 25, 1968.—Decided March 6, 1968.*

*Together with No. 258, *American Society of Travel Agents, Inc.*
v. *Aktiebolaget Svenska Amerika Linien (Swedish American Line)*
*et al.,* also on certiorari to the same court.

*Irwin A. Seibel* argued the cause for petitioners in No. 257. With him on the brief were *Solicitor General Griswold, Assistant Attorney General Turner, Louis F. Claiborne, Robert N. Katz* and *Gordon M. Shaw.*

*Robert J. Sisk* argued the cause for petitioner in No. 258. With him on the briefs were *Harold S. Barron* and *Glen A. Wilkinson.*

*Edward R. Neaher* argued the cause for respondents in both cases. With him on the brief were *Carl S. Rowe* and *Gertrude S. Rosenthal*.

MR. JUSTICE BLACK delivered the opinion of the Court.

The question presented in these cases is whether the Federal Maritime Commission properly disapproved two provisions of several shipping conference agreements. One of the provisions under attack, the so-called tying rule, prohibits travel agents who book passage on ships participating in the conferences from selling passage on competing, nonconference lines. The second provision, known as the unanimity rule, requires unanimous action by conference members before the maximum rate of commissions payable to travel agents may be changed.

The Commission's authority in this area stems from the Shipping Act, 1916.[1] Section 15 of this Act, as amended, requires common carriers by water to submit most of their cooperative agreements to the Commission and directs it to:

> "disapprove, cancel or modify any agreement, or any modification or cancellation thereof, whether or not previously approved by it, that it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors, or to operate to the detriment of the commerce of the United States, or to be contrary to the public interest, or to be in violation of this chapter . . . ."

In 1959 proceedings were initiated before the Federal Maritime Board, predecessor agency to the present Federal Maritime Commission, on the complaint of the American Society of Travel Agents, petitioner in No.

---

[1] 39 Stat. 728, as amended, 46 U. S. C. § 801 *et seq.*

258. The Society challenged a number of the practices of two conferences composed of steamship lines that furnish passenger service across the Atlantic. After extensive investigation and hearings before a Commission Examiner, the Commission disapproved both the tying and unanimity rules and ordered them eliminated. 7 F. M. C. 737 (1964). The Court of Appeals, however, set aside the order and remanded the case to the Commission for more detailed findings and explanations. 122 U. S. App. D. C. 59, 351 F. 2d 756 (1965). On remand the Commission again disapproved both rules. The tying rule was found detrimental to the commerce of the United States, unjustly discriminatory as between carriers, and contrary to the public interest. The unanimity rule was found detrimental to the commerce of the United States and contrary to the public interest. —— F. M. C. —— (1966). On appeal, the Court of Appeals again set aside the order, holding that the Commission's new opinion had not remedied the defects noted in the prior decision on appeal, 125 U. S. App. D. C. 359, 372 F. 2d 932 (1967), and we granted certiorari, 389 U. S. 816 (1967). We hold that the Commission's order was supported in all respects by adequate findings and analysis. We therefore reverse the judgment of the Court of Appeals and approve the order of the Commission.

## I.

An understanding of the issues in these cases will be facilitated by a very brief discussion of the purposes of these shipping conferences and the federal statutes enacted to regulate them. Major American and foreign steamship lines which compete for traffic along the same routes have long joined together in conferences to fix rates and other charges, allocate traffic, and in other ways moderate the rigors of competition. Despite traditional hostility to anticompetitive arrangements of this kind,

however, Congress found after extensive investigation that the cooperative activity of these conferences was to some extent in the public interest. The House Committee that conducted the primary inquiry reported that the conferences promoted:

> "regularity and frequency of service, stability and uniformity of rates, economy in the cost of service, better distribution of sailings, maintenance of American and European rates to foreign markets on a parity, and equal treatment of shippers through the elimination of secret arrangements and underhanded methods of discrimination." H. R. Doc. No. 805, 63d Cong., 2d Sess., 416.

These advantages, the Committee concluded, could probably not be preserved in the face of unrestricted competition, and accordingly it recommended that the industry be granted some exemption from the antitrust laws. On the other hand, the Committee stressed that an unqualified exemption would be undesirable. The conferences had abused their power in the past and might do so in the future unless they were subjected to some form of effective governmental supervision. In response to these findings Congress enacted the Shipping Act, 1916. The statute not only outlawed a number of specific abuses but set up the United States Shipping Board, a predecessor of the present Federal Maritime Commission, with permanent authority under § 15 of the Act to modify or disapprove conference agreements. The antitrust immunity conferred was, as the House Committee had recommended, a limited one—only agreements receiving the approval of the Board were exempted. Originally the Board could disapprove an agreement on only three grounds: unjust discrimination, detriment to commerce, or illegality under one of the specific provisions of the Act. In 1959, however, Congress began an extensive

review of regulation under the Shipping Act,[2] and amendments passed in 1961 in response to these studies[3] included a provision granting considerably broader authority by permitting disapproval under § 15 of any agreement found to be "contrary to the public interest." The scheme of regulation adopted thus permits the conferences to continue operation but insures that their immunity from the antitrust laws will be subject to careful control.

## II.

A crucial issue in these cases is respondents' challenge to the Commission's reliance on antitrust policy as a basis for disapproving these rules. Since the contention is equally relevant to analysis of the tying and unanimity rules, we consider it at the outset.

The Commission has formulated a principle that conference restraints which interfere with the policies of antitrust laws will be approved only if the conferences can "bring forth such facts as would demonstrate that the . . . rule was required by a serious transportation need, necessary to secure important public benefits or in furtherance of a valid regulatory purpose of the Shipping Act." See —— F. M. C., at ——. In the present cases, but for the partial immunity granted by the Act, both the tying and unanimity rules undoubtedly would be held illegal under the antitrust laws, and

---

[2] See Hearings before Antitrust Subcommittee of House Committee on the Judiciary, on Monopoly Problems in Regulated Industries: Ocean Freight Industry, 86th Cong., 1st and 2d Sess., ser. 14, Pt. 1, Vols. I–V, and Pt. 2, Vols. I–II (1959–1960), 87th Cong., 1st Sess., ser. 10, Pt. 3, Vols. I–II (1961); Hearings before Special Subcommittee on Steamship Conferences of House Committee on Merchant Marine and Fisheries, Steamship Conference Study, 86th Cong., 1st Sess., Pts. 1–3 (1959); H. R. Rep. No. 1419, 87th Cong., 2d Sess. (1962).

[3] 75 Stat. 762.

respondents failed to satisfy the Commission that the rules were necessary to further some legitimate interest. The Commission found this sufficient reason to disapprove the rules, but the Court of Appeals disagreed. Emphasizing that "[t]he statutory language authorizes disapproval only when the Commission finds as a fact that the agreement operates in one of the four ways set out in the section by Congress," the court held, "We do not read the statute as authorizing disapproval of an agreement on the ground that it runs counter to antitrust principles . . . ." 122 U. S. App. D. C., at 64; 351 F. 2d, at 761 (opinion on first appeal).

Insofar as this holding rests on the absence of an explicit antitrust test among the "four ways set out in the section," we think the Court of Appeals was excessively formalistic in its approach to the Commission's findings. By its very nature an illegal restraint of trade is in some ways "contrary to the public interest," and the Commission's antitrust standard, involving an assessment of the necessity for this restraint in terms of legitimate commercial objectives, simply gives understandable content to the broad statutory concept of "the public interest." Certainly any reservations the Court of Appeals may have had on this point should have been dispelled by the Commission's careful explanation on remand of the connection between its antitrust standard and the public interest requirement. See —— F. M. C., at ——. As long as the Commission indicates which of the statutory standards is the ultimate authority for its disapproval, we can see no objection to the Commission's casting its primary analysis in terms of the requirements of its antitrust test.

Respondents argue more broadly, however, that the antitrust test is not a permissible elaboration of the statutory standards. They contend that the whole purpose of the statutory scheme would be defeated if incom-

patibility with the antitrust laws can be a sufficient reason for denying immunity from these laws. Congress, it is argued, has already decided that there is a justification for intrusions on our antitrust policy by the conference system, and accordingly the Commission cannot require further justifications from the shipping lines but must itself demonstrate the way in which the statutory requirements are violated.

Respondents' arguments, however, are not even superficially persuasive. Congress has, it is true, decided to confer antitrust immunity unless the agreement is found to violate certain statutory standards, but as already indicated, antitrust concepts are intimately involved in the standards Congress chose. The Commission's approach does not make the promise of antitrust immunity meaningless because a restraint that would violate the antitrust laws will still be approved whenever a sufficient justification for it exists.[4] Nor does the Commission's test, by requiring the conference to come forward with a justification for the restraint, improperly shift the burden of proof. The Commission must of course adduce substantial evidence to support a finding under one of the four standards of § 15, but once an antitrust violation

---

[4] For this reason the Commission's antitrust standard is entirely consistent with respondents' evidence of a congressional recognition at the time the "contrary to the public interest" test was added in 1961, that "our traditional antitrust concepts cannot be *fully* applied to this aspect of international commerce." S. Rep. No. 860, 87th Cong., 1st Sess., 2 (1961) (emphasis added). And for the same reason respondents' reliance on *Seaboard Air Line R. Co.* v. *United States,* 382 U. S. 154 (1965), and *Minneapolis & St. Louis R. Co.* v. *United States,* 361 U. S. 173 (1959), is misplaced. The antitrust standard formulated here is in full accord with the kind of accommodation between antitrust and regulatory objectives approved by this Court in those cases. Indeed we have stressed that such an accommodation does not authorize the agency in question to ignore the antitrust laws. *E. g., McLean Trucking Co.* v. *United States,* 321 U. S. 67, 79–80 (1944).

is established, this alone will normally constitute substantial evidence that the agreement is "contrary to the public interest," unless other evidence in the record fairly detracts from the weight of this factor. It is not unreasonable to require that a conference adopting a particular rule to govern its own affairs, for reasons best known to the conference itself, must come forward and explain to the Commission what those reasons are. We therefore hold that the antitrust test formulated by the Commission is an appropriate refinement of the statutory "public interest" standard.

### III.

We turn then to the Commission's analysis of the specific impact of the unanimity rule. The rule is embodied in the basic agreement of the carriers in the Atlantic Passenger Steamship Conference, an association of the major lines serving passenger traffic between Europe and the United States and Canada. Article 6 (a) of this agreement provides that the rate of commission which member lines may pay to their agents must be established by unanimous agreement of the member lines. In addition, Article 3 (d) of the agreement permits the subcommittee with primary responsibility for suggesting commission rates to make recommendations to the full conference only when subcommittee members are in unanimous accord.

The Commission noted that at the time of its hearings, the commission paid by conference members to travel agents was substantially lower than that paid by the airlines. By the time the Commission wrote its opinion on remand, the conference had raised its commission to the level offered by the airlines, but the effective commission earned by travel agents remained lower on ocean travel because booking passage by sea requires three to four times as much of a travel agent's time as is required

to book air travel. The Commission found that the unanimity rule was responsible for the existing disparity between effective commissions on air and sea travel and for the delays in conference action to rectify the situation. On three specific occasions, lack of unanimity prevented the conference subcommittee from recommending an increase, even though a majority was recorded as being in favor of the proposals. The Commission also referred to several other occasions on which the conference and its subcommittee failed to take action. Because minutes apparently were not taken for these meetings, the Commission was unable to determine with certainty whether the unanimity rule had frustrated the will of a majority on these occasions.

The Commission then found that as a result of the relatively advantageous commission on sales of air travel, there was a definite tendency for travel agents to encourage their customers to travel by air rather than by sea. This situation in turn not only injured the majority of the shipping lines by diverting business to the airlines, but also injured the undecided traveler, who lost the opportunity to deal with an agent whose recommendations would not be influenced by his own economic interest. The Commission also found that respondents had failed to establish any important public interest served by the unanimity rule. Under these circumstances the Commission concluded that the rule was detrimental to commerce by fostering a decline in travel by sea, and contrary to the public interest in the maintenance of a sound and independent merchant marine. The Commission also found the rule contrary to the public interest in that it invaded the principles of the antitrust laws more than was necessary to further any valid regulatory purpose.

We find the Commission's analysis sound and the evidence in support of its conclusions more than ample.

Respondents attack the initial finding that the unanimity rule has blocked the desires of the majority to raise the commission rate, but the argument reduces to an insistence that the Commission establish this point by conclusive proof. It is true that there is no specific evidence in the record revealing that at any of the conference meetings where no action was taken, a majority favored an immediate increase.[5] But the Maritime Commission faces no such rigorous standard of proof. The issue to be decided was a purely factual one, and the Commission was entitled to draw inferences as to the wishes of the majority from the record as a whole. The record showed beyond doubt that in several instances a majority of the subcommittee favored an increase, and faced with the lack of proof one way or the other as to the wishes of the majority of the full conference, the Commission acted reasonably in assuming that the views of the subcommittee were not diametrically opposed to that of the entire membership. In addition, it is undisputed that the rule on several occasions operated to prevent a majority of the subcommittee from presenting its recommendations to the full conference, and the Commission could reasonably conclude that this impact on the subcommittee served in itself to delay or prevent action by the full conference. Although any conclusion as to the commission rate that would have prevailed under a different voting procedure must to some extent rest on "conjecture," the court below misconceived its reviewing

---

[5] Respondents correctly point out that there is no support for the Commission's finding that the majority of the members were unable to act at the meeting of February-March 1956 because of a veto exercised by one line. It does appear that at the meeting of May 3, 1960, a majority favored an increase, but the memorandum disclosing this does not indicate clearly whether the majority preferred to put the increase into effect immediately, or favored the actual decision to defer consideration.

function when it found this a sufficient basis for setting the Commission's finding aside. Having correctly noted that positive proof on various aspects of the case was simply not available one way or the other, the Commission was fully entitled to draw inferences on these points from the incomplete evidence that was available. "Conjecture" of this kind, when based on inferences that are reasonable in light of human experience generally or when based on the Commission's special familiarity with the shipping industry, is fully within the competence of this administrative agency and should be respected by the reviewing courts.

Respondents' attack on the finding that the commission disparity affected the recommendations of travel agents suffers from this same misconception of the Commission's task. It is true that no agent testified that he had ever persuaded a customer to travel by air over the customer's preference to travel by sea. Agents heavily dependent on conference business could hardly be expected to make such an admission, but one agent did go so far as to concede that under some circumstances, there was a "definite tendency" to encourage a customer to choose air travel because "it is easier to sell" and "you make more money." This amply supports the Commission's conclusion.

The final problem is respondents' claim that the rule is justified because none of the member lines, the American-flag minority in particular, wishes to surrender control over basic financial decisions to a majority of its competitors. This is a bewildering contention, to say the least. The rule may enable a single line to protect itself from a majority decision, but the rule in no way guarantees that line control over its own financial decisions. Lack of unanimity under this particular rule does not leave the lines free to make independent deci-

sions,[6] but simply freezes the existing situation. In this way control over the basic financial decisions of all lines is "surrendered" not to the majority but to any single line that happens to oppose change. We therefore find that the Commission's conclusions with respect to the unanimity rule were supported by substantial evidence and should have been upheld by the Court of Appeals.

## IV.

The tying rule is imposed by the second conference involved in these cases, the Trans-Atlantic Passenger Steamship Conference. This conference is composed of the major lines providing passenger service between America and Europe, and it has substantially the same membership as the conference which is formally responsible for the unanimity rule already considered. The tying rule prohibits all travel agents authorized to book passage for the member lines "from selling passage tickets for any steamer not connected with the fleets of the member Lines." The rule does not prohibit these agents from arranging air travel.

As the Commission correctly noted, this rule seriously interferes with the purposes of the antitrust laws. Under the Sherman Act, any agreement by a group of competitors to boycott a particular buyer or group of buyers is illegal *per se*. *United States* v. *General Motors,* 384 U. S. 127, 146–147 (1966); *Klor's* v. *Broadway-Hale Stores,* 359 U. S. 207 (1959). And the conference's tying rule specifically injures three distinct sets of interests. It denies passengers the advantages of being able to deal with a travel agent who can sell any means of travel. It denies agents the ability to serve passengers who wish

---

[6] Compare IATA Traffic Conference Resolution, 6 C. A. B. 639, 645 (1946). These airline conferences leave the individual members free to initiate their own rates when unanimous agreement cannot be reached.

to travel on nonconference lines. Most important, it denies nonconference lines the opportunity to reach effectively the 80% of all transatlantic steamship passengers who book their travel through conference-appointed agents.

Given these effects of the rule, which are not seriously disputed, it was incumbent upon the conference to establish a justification for the rule in terms of some legitimate objective. One of the possible purposes of the rule is to eliminate the competition of the nonconference lines, but this is not a permissible objective under the Shipping Act, see *Federal Maritime Board* v. *Isbrandtsen Co.*, 356 U. S. 481, 491–493 (1958), and respondents quite properly do not press it. Respondents do contend, however, that the rule is justified as a means of preserving the stability of the conference. By choosing and supervising responsible agents who will book steamship passage only for its members, the conference creates an incentive for members to remain in the conference and for other lines to join. The Commission found no indication, however, that elimination of the rule would in fact jeopardize the stability of the conference. Although no evidence in the record actually tends to refute respondents' theory,[7] it is also clear that respondents failed to come forward with any evidence to support their claim. The theory was therefore insufficient to justify the undeniable injury to interests ordinarily protected by the antitrust laws.

Equally insubstantial is the second justification presented by respondents, that the conference members bear

---

[7] The Commission's reference to the fact that the Caribbean cruise trade operates without a tying rule does not seem to meet respondents' contention. Since the Caribbean cruise trade operates without a conference at all, the lack of a tying rule would in no way indicate the extent to which such a rule tends to strengthen membership in conferences.

the expense of selecting and supervising qualified agents and that other lines who wish to take advantage of these efforts should pay their fair share by joining the conference. The Commission found that most of the expenses incurred by the conference were in fact reimbursed by the agents themselves through annual fees. Many of the promotional activities were paid for by individual lines, and in addition these arrangements often required matching contributions by the agents. In light of these factors the Commission properly concluded that although the conference's efforts might entitle it to exercise some control over the agents' activities, there was no justification for completely prohibiting the agents from dealing with nonconference lines.

These circumstances taken together provide substantial support for all three of the Commission's findings—that the rule is detrimental to the commerce of the United States by injuring passengers, agents, and nonconference lines; that the rule is unjustly discriminatory as between conference and nonconference carriers, and that the rule is contrary to the public interest by unnecessarily invading the policies of the antitrust laws.

## V.

For the reasons indicated the Commission properly disapproved the tying and unanimity rules involved in these cases. These proceedings were commenced more than eight years ago, and this is the second time the controversy has been appealed to the reviewing courts. On the second appeal to the Court of Appeals, that court took the extraordinary course of simply reversing, without remanding to the Commission for further action. Since we have found that the Commission's findings and order are supported by substantial evidence, and since there are no other meritorious contentions raised by the respondents, we think it is time for a final dis-

position of the proceedings. The judgment of the Court of Appeals is reversed, and the cases are remanded with directions to affirm the order of the Commission.

*It is so ordered.*

MR. JUSTICE MARSHALL took no part in the consideration or decision of these cases.

MR. JUSTICE HARLAN, concurring in the result.

I concur in the result reached by the Court, substantially for the reasons stated in the Court's opinion. However, I cannot join in the Court's general statements, *ante,* at 244–246, concerning the relationship between the antitrust laws and the "contrary to the public interest" standard of § 15 of the Shipping Act. It seems plain that the "contrary to the public interest" test was intended to comprehend factors unique to the shipping industry as well as those embodied in the antitrust laws. Hence, I believe that under the Act the Commission may not place upon a shipping conference the burden of justifying an agreement until the Commission has determined that in light of *both* shipping and antitrust factors the agreement would be "contrary to the public interest" in the absence of further explanation.