**AMERICAN IMPORTERS ASSOCIATION, Petitioner,**

v.

**CIVIL AERONAUTICS BOARD, Respondent.**

**No. 24849.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 16, 1971.

Decided Nov. 29, 1972.

Mr. Robert A. Peavy, Washington, D. C., with whom Mr. Edward Schmeltzer, Washington, D. C., was on the brief, for petitioner.

Mr. Alan R. Demby, Atty., Civil Aeronautics Bd., with whom Messrs. R. Tenney Johnson, Gen. Counsel, O. D. Ozment, Deputy Gen. Counsel, Warren L. Sharfman, Associate Gen. Counsel, Liti-

gation and Research, Robert L. Toomey, Atty., Civil Aeronautics Bd., and Howard E. Shapiro, Atty., Dept. of Justice, were on the brief, for respondent.

Before FAHY, Senior Circuit Judge, and LEVENTHAL and MacKINNON, Circuit Judges.

PER CURIAM:

The case is before us on a petition to review two orders of the Civil Aeronautics Board (the Board) filed by the American Importers Association (AIA), a trade association whose members include importers and customs brokers. The principal order of May 19, 1970,[1] embodies conditional Board approval through September 30, 1971 under Section 412 of the Federal Aviation Act of 1958[2] (the Act), of an agreement submitted by the International Air Transport Association (IATA), a trade association comprising domestic and international airlines engaged in air transportation to and from the United States. A second order under review, of October 9, 1970, denied reconsideration of the order of May 19.[3] The Board has filed with the court, without objection on the part of AIA, a subsequent order of October 13, 1971, extending approval of the agreement for an additional two years, presumably until September 30, 1973.[4]

Approval of the agreement by the Board has the effect, under the provisions of section 414 of the Act,[5] of relieving any affected person from the operation of the anti-trust laws. Our jurisdiction to review the orders of the Board is spelled out in section 1006(a) of the Act.[6]

## I. THE NATURE OF THE AGREEMENT

The obligation of the air carriers to importers includes the unloading and temporary storage of the goods imported. Upon expiration of the temporary

---

1. No. 70–5–93.

2. Section 412 provides:
 (a) Every air carrier shall file with the Board a true copy, or, if oral, a true and complete memorandum, of every contract or agreement (whether enforceable by provisions for liquidated damages, penalties, bonds, or otherwise) affecting air transportation and in force on the effective date of this section or hereafter entered into, or any modification or cancellation thereof, between such air carrier and any other air carrier, foreign air carrier, or other carrier for pooling or apportioning earnings, losses, traffic, service, or equipment, or relating to the establishment of transportation rates, fares, charges, or classifications, or for preserving and improving safety, economy, and efficiency of operation, or for controlling, regulating, preventing, or otherwise eliminating destructive, oppression, or wasteful competition, or for regulating stops, schedules, and character of service, or for other cooperative working arrangements.
 (b) The Board shall by order disapprove any such contract or agreement, whether or not previously approved by it, that it finds to be adverse to the public interest, or in violation of this Act, and shall by order approve any such contract or agreement, or any modification or cancellation thereof, that it does not find to be adverse to the public interest, or in violation of this Act; except that the Board may not approve any contract or agreement between an air carrier not directly engaged in the operation of aircraft in air transportation and a common carrier subject to the Interstate Commerce Act, as amended, governing the compensation to be received by such common carrier for transportation services performed by it. 72 Stat. 770, 49 U.S.C. § 1382 (1970).

3. No. 70–10–53.

4. No. 71–10–49.

5. Section 414 provides:
 Any person affecting by any order made under sections 408, 409, or 412 [49 U.S.C. §§ 1378, 1379, 1382] of this Act shall be, and is hereby, relieved from the operations of the "antitrust laws", as designated in section 1 of the Act [15 U.S.C. § 12] entitled "An Act to supplement existing laws against unlawful restraints and monopolies, and for other purposes," approved October 15, 1914, and of all other restraints or prohibitions made by, or imposed under, authority of law, insofar as may be necessary to enable such person to do anything authorized, approved, or required by such order. 72 Stat. 770, 49 U.S.C. § 1384 (1970).

6. 72 Stat. 795, 49 U.S.C. § 1486(a) (1970).

storage period—otherwise known as "free time" or "free storage time"—demurrage may be assessed against importers.

At the Conference of IATA held in Athens, Greece, in 1969, the member carriers agreed, *inter alia,* to reduce the period of free storage time at international air terminals in the United States from three to two days and to eliminate the provision in the then-existing agreement that allowed carriers to enter into local agreements enlarging the three-day period to meet local conditions.

## II. OUTLINE OF THE PROCEEDINGS BEFORE THE BOARD

IATA filed with the Board the proposed free time agreement, along with many others reached at the Athens Conference. In an order of July 16, 1969,[7] the Board made a tentative finding that the agreement was not adverse to the public interest but deferred final action "with a view toward eventual approval," and allowed interested parties to file comments within fifteen days. AIA timely opposed the reduction of free time and the elimination of the local agreement provision, maintaining that restriction of the carriers' competition raised antitrust problems and that a wooden free storage time rule made on a nationwide basis cannot take into account the quite different local conditions that affect the reasonableness of the free time period. AIA suggested that the Board first study the impact of such a change on the users of airline services. It was further suggested by AIA that the agreement was too vague because it failed to specify when the free storage period would begin and that it made no provision for notice of arrival. AIA argued that this could result in the assessment against importers of demurrage on shipments that arrived without their knowledge.

Apparently acting as spokesmen for the IATA carriers, Pan American Airways (PanAm) and TransWorld Airlines (TWA) together filed a brief response to AIA's petition, stating that the elimination of the local agreement provision provides an incentive to carriers: shippers tend to avoid those carriers whose services makes necessary the payment of demurrage. Moreover, the carriers maintained that such a provision will help to relieve the congestion at the busier air terminals. In support of their position, the carriers submitted data indicating that in practice the free storage rules never result in less than 56 hours of free time, and for about 58% of import traffic (based on a survey of PanAm import traffic into Kennedy International Airport in New York for an unspecified period of time) the rules allow up to 104 hours of free time.

On September 15, 1969, the Board approved the agreement for six months, stipulating that the free time period must not begin to run until 8:00 A.M. of the day (not including weekends and legal holidays) following the date of notification of arrival.[8] On March 19, 1970, PanAm and TWA petitioned the Board to extend its approval of the free time agreement. They represented to the Board that adequate notification procedures had been adopted and that the free time agreement operated equitably between the carriers and importers. The two carriers reiterated the benefits of the agreement, that of relieving congestion at crowded terminals and spurring competition among carriers to provide the most expeditious service. AIA responded by submitting the results of a survey conducted of its members. The data demonstrated that at two of the busiest United States airports, free time was nearly always exceeded. The survey suggested that part of the difficulty was attributable to the inadequate notification and handling procedures of the carriers. Once again AIA raised the antitrust question.

By its order of May 19, 1970, the Board conditionally approved the agree-

7. No. 69–7–76.

8. Order No. 69–9–90.

ment until September 30, 1971, stating that the AIA survey failed to show the reasons that free time was so frequently exceeded. The Board also observed that free time on domestic shipments is only one calendar day after date of notification of arrival, and that the ground handling procedures are essentially the same for IATA and domestic carriers. According to the Board, this gives the IATA carriers an entire calendar day for customs clearance, a procedure not required on domestic shipments. In its May 19 order, however, the Board also stated it was incumbent upon the carriers to maintain records and employ procedures to insure the correct application of storage charges when appropriate, and that the Board would expect that records and procedures developed by the carriers would provide adequate safeguards against the assessment of storage in situations where freight is not available for pickup because it cannot be located or for any other reason. The Board also stated it expected the carriers to abide by their tariffs with respect to the assessment of storage charges, where appropriate, under their rules.

## III. THE PRINCIPAL LEGAL CRITERIA GOVERNING REVIEW OF THE ORDERS

AIA maintains that the Board's opinion is not supported by adequate evidence and does not contain a sufficiently reasoned explanation of the Board's action. AIA further contends that the procedures employed by the Board deprived AIA of a fair hearing.

■ Where, as here, agreements between air carriers are submitted for approval by the Board, section 412(b), 72 Stat. 770, 49 U.S.C. § 1382(b), of the Act provides:

> The Board . . . shall by order approve any such contract or agreement . . . that it does not find to be adverse to the public interest, or in violation of this Act. . . .

The Board shall disapprove any agreement

> that it finds to be adverse to the public interest, or in violation of this Act.
> . . .

Section 1005(f) of the Act further provides that "every order of the Administrator or the Board shall set forth the findings of fact upon which it is based. . . ." 72 Stat. 795, 49 U.S.C. § 1485(f) (1970). The three provisions read together assume that approval is to be based upon a finding supported by a record which justifies any decision reached respecting the public interest.

### A. The Antitrust Claim

■ The agreement binds the carriers to a specified free time and precludes divergence therefrom due to local conditions. Such a restraint upon competition gives rise to a colorable antitrust claim:

> [C]olorable antitrust claims should be considered substantively important. In IATA Credit Agreements, 30 C.A.B. 1553, 1554–1555 (1960), the Board ruled that when IATA resolutions appear on their face to be repugnant to antitrust principles, they cannot be approved under section 412 "unless their proponents have made a clear showing of the need for approval to fill [a] serious transportation need or secure important public benefits." This principle has been an established aspect of the Board's regulatory policy since the Local Cartage Agreement Case, 15 C.A.B. 850, 853 (1952).

National Air Carriers Ass'n v. CAB, 141 U.S.App.D.C. 31, 38, 436 F.2d 185, 192 (1970). Cf. Trailways of New England, Inc. v. CAB, 412 F.2d 926, 936 (1st Cir. 1969).

This view of the public interest criteria is supported by the judicial construction of analogous provisions of the Shipping Act of 1916, under which the Federal Maritime Commission has authority to disapprove conference agreements among shipping lines that the Commission finds to be "contrary to the public

interest, or to be in violation of" the Act.[9] In considering this provision in FMC v. Svenska Amerika Linien, 390 U.S. 238, 244–246, 88 S.Ct. 1005, 1009, 19 L.Ed.2d 1071 (1968), the Supreme Court said:

> By its very nature an illegal restraint of trade is in some ways "contrary to the public interest," and the Commission's antitrust standard, involving an assessment of the necessity for this restraint in terms of legitimate commercial objectives, simply gives understandable content to the broad statutory concept of "the public interest."
>
> . . .
>
> * * * * * *
>
> . . . Congress has, it is true, decided to confer antitrust immunity unless the agreement is found to violate certain statutory standards, but as already indicated, antitrust concepts are intimately involved in the standards Congress chose. . . . [A] restraint that would violate the antitrust laws will still be approved whenever a sufficient justification for it exists. Nor does the Commission's test, by requiring the conference to come forward with a justification for the restraint, improperly shift the burden of proof. The Commission must of course adduce substantial evidence to support a finding under one of the four standards of § 15 [of the Shipping Act], but once an antitrust violation is established, this alone will normally constitute substantial evidence that the agreement is "contrary to the public interest," unless other evidence in the record fairly detracts from the weight of this factor. (Footnote omitted.)

See also the discussion of "public interest" in WAIT Radio v. FCC, 135 U.S. App.D.C. 317, 418 F.2d 1153 (1969); Latin America/Pacific Coast Steamship Conference et al. v. FMC, 150 U.S. App.D.C. 362, 465 F.2d 542 (1972), cert.

denied, 409 U.S. 967, 93 S.Ct. 269, 34 L. Ed.2d 234 (1972).

In view of these principles, it is essential in the face of an antitrust claim that the Board's approval rest upon a sufficient justification for tolerating the restraint.

B. *The Claim that AIA was Deprived of a Fair Hearing*

■ AIA concedes in its brief that it is not entitled to a full-scale evidentiary hearing, and it had not asked for one in the proceedings before the Board. It does contend that the Board failed to take steps that could have enabled the Board to reach an informed decision regarding the free time agreement. In view of our disposition of the case we need not detail the procedures the Board should take in various circumstances which may arise, noting only at this time that the Board has latitude in that regard. National Air Carrier Ass'n v. CAB, *supra.*

IV. DISPOSITION OF THE ISSUE OF REDUCTION OF THE FREE STORAGE TIME FROM THREE TO TWO DAYS

As to this issue, the position of the Board is that the agreement was designed to serve the primary objective of relieving terminal congestion which results from extended storage of shipments, particularly at high density airports such as John F. Kennedy International, the reason stated by the carriers in one of their submissions to the Board, as "an incentive to move consignments through the carrier facility promptly and thus to open up space for handling of other freight."

In light of the history of the controversy since it originated before the Board we have concluded the record furnishes an inadequate basis for decision of the issue now considered. The form in which the Athens resolution of IATA

---

9. *See,* Note, Portland's Complaint: The Impact of Containerized Shipping on Inter-Port Competition, 4 Law & Pol. Int'l Bus. 65, 70–78 (1972).

was approved by the Board on July 16, 1969, on the basis of a tentative finding that it was not adverse to the public interest, was modified by the Board in two important respects on September 15, 1969. It was then approved in modified form for six months and thereafter has been extended as we have explained. The modifications were that the period of free time would not begin to run against the importer until 8 o'clock of the morning following notification of arrival of the shipment, and, also, that legal holidays and weekends would be not included. Partially due to a survey which it had made, AIA continued to maintain that the free time was generally exceeded, and suggested that part of the difficulty it experienced, and upon which its objections were based, were the inadequate notification and handling procedures of the carriers. In response, when the Board on May 19, 1970, by its principal order now under review, extended its approval until September 30, 1971, the Board admonished the carriers that it was incumbent upon them to maintain records and employ procedures to insure the correct application of storage charges when appropriate, and that the Board would expect the records and procedures developed by the carriers to provide adequate safeguards against the assessment of storage in situations where freight is not available for pickup because it cannot be located, or for any other reason.

 We thus have a situation in which the experience under the modified agreement, as approved and extended, coupled with the admonitions of the Board to the carriers on May 19, 1970,[10] responsive in part to AIA's objections, is not adequately reflected in the record. We think in this situation an appropriate course for the court to follow is to suspend our decision, with respect to the approval by the Board of the agreement reducing free time from three to two days, pending further proceedings before the Board on the remand which we shall order. We have authority to require such further proceedings, where appropriate. Section 1006(d) of the Act, 72 Stat. 795, 49 U.S.C. § 1486(d). See also, Ford Motor Co. v. NLRB, 305 U.S. 364, at 373, 59 S.Ct. 301, 83 L.Ed. 221 (1939); cf. Air Line Pilots Ass'n, et al. v. CAB, 148 U.S.App.D.C. 24, 458 F.2d 846 (1972). Ordinarily, of course, our review of a Board order should be made, and a decision reached with respect to it, upon the record filed with this court as required by section 1006(c) of the Act, 72 Stat. 795, 49 U.S.C. § 1486(c); but the ongoing operations at the international air terminals since the modifications and admonitions to which we have referred, might well have illuminated factors bearing on the public interest to a degree which justifies amplification of the record for Board consideration prior to final decision by the court. A remand for that purpose would afford the parties and, if need be, the Board, an opportunity to present such additional data, in light of experience, as may be considered relevant to the public interest, followed by reconsideration by the Board and such further findings and orders as it may deem required or desirable, under the public interest standard which governs its decisions, including as well the issue of local flexibility now to be considered. This court in the meantime will retain jurisdiction, with final decision to await the filing of the amplified record and such supplemental action as the Board may take on the basis thereof.

## V. DISPOSITION OF THE ISSUE OF FLEXIBILITY AND LOCAL OPTION

The prior IATA rule permitted carriers, by local agreement, to extend free storage time. This flexibility provision was invoked (a) in the past by the carriers setting free storage time at all United States airports at 120 hours;

10. We have pointed out hereinabove that the approval of the modified agreement appears to have been extended to September 30, 1973.

(b) in early 1969, by reducing free storage time at United States airports to three days (a reduction postponed for a period as to John F. Kennedy Airport), with provision for extension where required at particular airports. At the Athens meetings referred to, IATA adopted an agreement, to become effective October 1, 1969, to eliminate local carrier flexibility, thus reducing the allowance to two free storage days.

In addition to its complaint regarding the reduction to two days, already discussed, AIA also complains of the elimination of any mechanism for establishing a longer period to meet local conditions at particular air terminals.

Although this issue is also posed by AIA in a broad allegation of anticompetitive restraints, we take note that in no event is it proposed that each carrier be free to compete on its own terms. The issue becomes one of whether the restraints should be determined by agreement of the carriers at an airport, or the carriers taken nationally, or even internationally. And the underlying question may prove in fact to be one of restraints on airports, rather than on carriers, with little to be said, at least in the abstract, for the freedom of an airport to compete for the business of importers by prompting an extension of free storage time through failure to correct conditions of congestion.

There is room for an expectation that a regulation that is generally fair and reasonable may be applied uniformly throughout the nation, on the assumption that while conditions inevitably will differ somewhat from one airport to another, the differences are likely to be a matter of economic strains rather than injustice. The burden would be on the party seeking to establish an exception.[11] But that would not necessarily be the case in a field where the inherent conditions at airports are very substantially different from each other. When there are such differences in fact, the Board is not entitled to follow Procrustes in

bringing all to one size. And when, as here, the background information establishes that John F. Kennedy Airport, a high density airport of particular interest to importers, and presenting to the importer the need for calling on the various carriers at their separate buildings, has in the past been given differential treatment by the carriers because of local conditions, any Board approach would realistically require support in evidence covering that airport. Indeed, since any real complaint of importers is likely to relate to a high-density terminal, it would seem probable that a free storage time regulation could hardly be generally reasonable unless it were reasonable for such a terminal.

If the basic free storage period is sufficient to allow a reasonable period for the clearance of cargo at United States airports, generally, without "injustice" at any airport, we fail to discern why as a matter of law it must now be decided to permit local flexibility in case that condition should become insufficient in the future as to some particular airport. That problem can be faced when the condition arises, on a petition to modify the approval, or to permit it to expire at the end of its term, in the light of the circumstances. Compare American Airlines v. CAB, 123 U.S.App.D.C. 310, 359 F.2d 624 (en banc), cert. denied, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966).

The possibilities of abuse would seem to be enough basis for the Board to insist, should it find it to be in the public interest to do so, that any such determination as to need for extent and nature of local flexibility should be subject to its prior review, rather than be determined by the air carriers on their own.

Another problem would be presented if it should develop, on remand, that conditions at a particular airport or airports are such that the two-day period, following notification of the importer that the goods are ready to be picked up, is simply not sufficient for even reason-

11. Compare WAIT Radio v. FCC, 135 U.S.App.D.C. 317, 418 F.2d 1153 (1969).

able diligent importers at such port to effect removal. In that event, the Board should consider what it deems appropriate in the public interest. It may be that the Board will conclude that in the interest of efficiency, and what is judged to be feasible for achievement by reasonably diligent airport management, no exceptions should be made. It may be that temporary relief should be provided, as was done in 1969 for John F. Kennedy Airport, while facilities were being constructed. The Board's course of approvals limited in duration gives it flexibility. We cannot consider to what extent or in what way it might be constrained by inhibitions of law, in the absence of a factual predicate, and a Board analysis.

It seems to us sufficiently likely that the Board's May 19, 1970, order avoids serious injustice that we decline to reach any final conclusion as to the flexibility issue on the present record, and defer it to await the proceedings on remand of the record, with the same opportunities afforded as we have noted with respect to the remand of the issue of reduction of free storage time from three to two days.

The record is remanded to the Board for further proceedings not inconsistent with this opinion.

MacKINNON, Circuit Judge, dissenting:

The necessity and desirability of cargo carriers having uniform demurrage (detention) rules is so well established and recognized in our jurisprudence as being in the public interest that it is my view no substantial antitrust issue is present. The one-day detention rule for domestic shipments and the rate to be charged are not challenged. Thus, the only question here is whether one extra day to allow for customs clearance of imported goods is sufficient and reasonable. To suggest that the allowable var-

iants of the decision on this question trespass into the antitrust area sufficient to constitute a restraint upon competition are hardly worth noting. The issue is paper-thin and completely within the Board's competence and expertise.

It is necessary to have detention rules that are fair, reasonable and uniform if airline traffic is to be carried on smoothly, equitably, efficiently and without discrimination and preference between localities and interests. We have upheld the right of the Federal Maritime Commission to enforce uniform detention rules on the marine terminals under its jurisdiction.[1] In the case of the railroads, such demurrage rules were forced on the carriers by the United States Commissions and the Interstate Commerce Commission because they recognized the public interest required them.[2]

The National Association of Railway Commissioners, an association comprising the commissioners of the several States, adopted in November, 1909, a uniform demurrage code. Its action was based upon extensive investigations and thorough discussion, participated in by the railroad commissioners, commercial organizations, representatives of railroads and individual shippers from all parts of the country. On December 18, 1909, the Interstate Commerce Commission endorsed the rules so adopted and recommended that they be made effective on interstate transportation throughout the country. (In re Demurrage Investigation, 19 I.C.C. 496).—Swift & Co. v. Hocking Valley Ry. Co., 243 U.S. 281, 37 S.Ct. 287, 61 L.Ed. 722, affirming 93 Ohio St. 143, 112 N.E. 212.

For the text of the original uniform code, and discussion thereof, see 21 Ann.Rep.Natl.Assn. of Ry.Commrs. (1909), pp. 203–240.

---

1. American Export-Isbrandtsen Lines, Inc. v. Federal Maritime Commission, 143 U.S. App.D.C. 366, 444 F.2d 824 (1970).

2. For the history of railroad demurrage rule *see* Hartman, Law and Theory of Railway Demurrage Charges 1–5 (1928).

The commission has frequently pointed out the desirability of uniformity in dealing with car detention, and declined to approve exceptions to the uniform demurrage rules, in favor of particular traffic.—Demurrage Rules on Coke, 96 I.C.C. 731; Demurrage on Coal and Coke, 102 I.C.C. 554.

Existence of merely unique or exceptional transportation conditions in certain localities furnishes no ground for exceptions being made to the uniform code in favor of such localities unless clearly unlawful discrimination would result against such localities if exceptions were not made.—Michigan Mfrs. Assn. v. Pere Marquette R. Co., 31 I.C.C. 329; Merchants & Panters Compress & Warehouse Co. v. Galveston, H. & H. R. Co., 129 I.C.C. 477.

Provision for exceptional cases would rob rules of their efficiency.—Michigan Mfrs. Assn. v. Pere Marquette R. Co., 31 I.C.C. 329.

1 Interstate Commerce Acts Annotated 721 (1930).

This Uniform Code has been approving construed by the Supreme Court on a number of occasions. For example, in Pennsylvania R. Co. v. Kittanning I. & S. Mfg. Co., 253 U.S. 319, 323–324, 40 S.Ct. 532, 533, 64 L.Ed. 928 (1920):

The purpose of demurrage charges is to promote car efficiency by penalizing undue detention of cars. The duty of loading and of unloading carload shipments rests upon the shipper or consignee. To this end he is entitled to detain the car a reasonable time without any payment in addition to the published freight rate. The aim of the Code was to prescribe rules, to be applied uniformly throughout the country, by which it might be determined what detention is to be deemed reasonable. In fixing the free time the framers of the Code adopted an external standard; that is, they refused to allow the circumstances of the particular shipper to be considered.

When they prescribed 48 hours as the free time, they fixed the period which, in their opinion, was reasonably required by the average shipper to avail himself of the carrier's service under ordinary circumstances. The framers of the Code made no attempt to equalize conditions among shippers. It was obvious that the period fixed was more than would be required by many shippers most of the time; at least, for certain classes of traffic; and that it was less than would be required by some shippers, most of the time, for any kind of traffic. Among the reasons urged for rejecting consideration of the needs or merits of the individual shipper, was the fear that, under the guise of exempting shippers from demurrage charges because of conditions peculiar to them, unjust discrimination and rebates to favored shippers might result.

See also Swift & Co. v. Hocking Valley R. So., 243 U.S. 281, 37 S.Ct. 287, 61 L. Ed. 722 (1917). The need for uniformity in demurrage rules has been frequently recognized by the I.C.C. Chrysler Corp. v. N. Y. Central R. Co., 234 I. C.C. 755, 759 (1939); N. Pac. Millers' Assn. v. Chicago, M., St. P. & P. R. Co., 181 I.C.C. 750, 754 (1932); Mich. Manufacturers's Assoc. v. Pere Marquette R. Co., 31 I.C.C. 329, 330 (1914). In this latter case the Commission stated:

The code here under attack was adopted by the carriers in November, 1909. In several proceedings that have been brought before us seeking modifications of certain of its provisions the Commission has emphasized the fact that the code was not prepared by the carriers but by a committee of the National Association of Railway Commissioners, composed of a representative of each state that had a railway commission and a member of the Interstate Commerce Commission, and that the action of this body in recommending the adoption of the code was taken only after an extensive investigation and a thorough discussion, participated in by railroad com-

missioners, commercial organizations, representatives of railroads, and individual shippers from all parts of the country. It was the opinion of the committee that prepared the code that uniformity in its provisions was most necessary for its successful operation, and that if it was sought by the rules to provide for exceptional cases the rules would be robbed of their efficiency. See report of the committee on car service and demurrage on page 231 of the proceedings of the twenty-first annual convention of the National Association of Railway Commissioners.

It also seems that the petitioner here is relying upon the congestion at Kennedy International Airport *under the prior rule* [3] to justify a flexible rule for local airports under the *new rule*.[4] However, when the rule was changed by the Board's order of 1969 so that free time does not begin to run until the consignee has been *notified* of the arrival of the goods and they are *available* for *pickup* all talk of congestion being a factor is beside the point. If congestion, or any other factor, prohibits, delays or interferes with pickup of the goods, free time does not even begin to run under the new rule. Thus, under the new rule it is not necessary to allow for any flexibility because of congestion.

It is my view that with the issue being the limited one that it is, there being no challenge to the one-day rule for domestic shipments, and the detention charge not being questioned, that the Board was well within its authority in approving the agreement. I would accordingly affirm the Board without requiring the remand.

3. Under the prior rule free time began to run after "8:00 A.M. of the day following *arrival* at the airport" of the goods (J.A. 17).

4. The detention rule approved by the CAB by its Order 69–7–90 on September 15, 1969 provided that "free storage periods for [imported shipments] . . . shall not commence until the day following *notification* to the consignee or his agent that a consignment has arrived *and is available for the purpose of clearing Customs.* This condition . . . will assure that importers will not be subject to demurrage payments occasioned by operational difficulties [congestion] at airports." (J.A. 18) (Emphasis added.)