CHESAPEAKE AND OHIO RAILWAY COMPANY, et al., Missouri Pacific Railroad Company, Grand Trunk Western Railroad Company, and Detroit, Toledo & Ironton Railroad Company, Petitioners,

American Paper Institute, Inc., Intervening Petitioner,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents.

Nos. 81–2286, 82–1693 and 82–1625.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 11, 1983.

Decided April 4, 1983.

John C. Danielson, Detroit, Mich., Michael Thompson, St. Louis, Mo., for petitioners.

Cecelia E. Higgins, I.C.C., John J. Powers, III, Dept. of Justice, Washington, D.C., for respondents.

Before PELL, CUDAHY and POSNER, Circuit Judges.

POSNER, Circuit Judge.

Several railroads and a shipper group ask us to set aside the Interstate Commerce Commission's decision in *Changes in Routing Provisions—Conrail—July 1981,* 365 I.C.C. 753 (1982), approving Conrail's cancellation of a large number of joint rates. The decision was based on 49 U.S.C. § 10705(e), which provides that "the carrier proposing the cancellation has the burden of proving that cancellation is consistent with the public interest," and that in deciding whether it is consistent with the public interest the Commission shall "(1) compare the distance traveled and the average transportation time and expense required using (A) the through route, and (B) alternative routes, between the places served by the through route; (2) consider any reduction in energy consumption that may result from cancellation; and (3) consider the overall impact of cancellation on the shippers and carriers that are affected by it."

Conrail filed the cancellation tariff in July 1981. The Commission launched an investigation but decided not to suspend the tariff, and it went into effect on July 25. In December, Conrail submitted to the Commission a study, based on its early experience with the cancellations, in which it attempted to show that the cancellations were in the public interest. Whether the study provided an adequate basis for the Commission's decision approving the cancellations is the principal question raised by the petition for review, but before getting to it we shall address the other questions that the petitioners raise.

They argue that the Commission misled them about the criteria that would be applied in the proceeding. Another provision of the Interstate Commerce Act, 49 U.S.C. § 10705a(c), allows a railroad to cancel a joint rate without satisfying the public interest standard of section 10705(e) if the rate is not generating enough revenue to cover the railroad's variable costs plus a prescribed margin; and the petitioners say that the Commission led them to believe that Conrail's cancellations would be evaluated under that standard. But the Commission had stated explicitly in its notice of investigation that it was proceeding under both 10705(e) and 10705a(c), so the petitioners—who in fact put in a lot of evidence that could only have been relevant to 10705(e)—had no cause to complain when the Commission decided to drop its consideration under the alternative standard. Cf. *Southern Ry. v. ICC,* 681 F.2d 29, 32 n. 8 (D.C.Cir.1982).

We are also unpersuaded that the Commission's decision allows Conrail to break its contracts with the protesting carriers—something the Commission can authorize under 10705a(c) (see 49 U.S.C. § 10705a(c)(1)) but not under 10705(e). The petitioners would have us believe that Conrail signed contracts of perpetual duration. This is not only hard to believe but contrary to contract language binding the parties to maintain the joint rates "unless and until otherwise authorized by the Commission." The Commission's decision is that authorization.

The petitioners argue that the decision gives insufficient weight to the public interest in preserving competition. (The petitioning railroads' argument that the joint-rate cancellations discriminate against them is a variant of the argument that the cancellations are anticompetitive.) That interest is implicit in the statutory require-

ment that the Commission evaluate the impact of a joint-rate cancellation on shippers and carriers and explicit in the national transportation policy for railroads, 49 U.S.C. § 10101a, which is to guide the Commission in applying the rail provisions of the Interstate Commerce Act. However, the Commission did not say much in its opinion about competition except that "by changing the point of interchange, Conrail does increase its portion of the haul. But, this does not affect competition; it only affects divisions."

To understand what the Commission was getting at, suppose that MoPac and Conrail established—maybe by order of the Commission, see 49 U.S.C. § 10705(a)(1)—two through routes for the carriage of a particular commodity from a particular place of origin in MoPac's service area to a particular destination in Conrail's. On one through route the point of interchange—the marshaling yard where the shipment is handed over from MoPac to Conrail—is in Chicago; on the other it is in East St. Louis. Although the routes are different, the origin, destination, and commodity are the same, so the joint rates almost certainly would have to be the same to avoid violating the prohibition against rate discrimination in 49 U.S.C. § 10741(a). However, the "divisions" (the respective revenue shares of the carriers participating in the joint rates), which may also have been prescribed by the Commission (see 49 U.S.C. § 10705(a)(1)) rather than being a product of negotiation, might differ between the two routes. Suppose that because it gets a bigger division on the route that runs through East St. Louis, Conrail cancels the joint rate on the Chicago route, hoping to divert traffic to the East St. Louis route. The shipper can still route the shipment through Chicago, see 49 U.S.C. § 10763(a)(1), but he will have to pay the rates set by each carrier individually for its segment of the haul, and the sum of these "combination rates," as they are called, will almost certainly exceed the joint rate that they replace.

Although the Commission would not acknowledge that the effect of cancelling a joint rate is to "close" the through route, the whole point of cancellation is to divert traffic to an alternative route, and diversion implies "closure"—whether total or partial is a detail. In our example, Conrail's hope would be to divert traffic to the alternative through route—on which presumably it gets a bigger division—running through East St. Louis.

■ So by changing the point of interchange Conrail may be able to get a larger share of revenue, as the Commission said. But this result is necessarily anticompetitive only if "competition" means protecting the revenues of Conrail's competitors. If instead it means securing the allocation of resources that is brought about by well functioning competitive markets—the allocation that best serves consumers, including shippers (the immediate though not ultimate consumers of railroad services)—then a shift of revenues from one carrier to another is not in itself anticompetitive. The allocative-efficiency or consumer-welfare concept of competition dominates current thinking, judicial and academic, in the antitrust field. See, e.g., *Reiter v. Sonotone Corp.*, 442 U.S. 330, 343, 99 S.Ct. 2326, 2333, 60 L.Ed.2d 931 (1979); *Products Liability Ins. Agency, Inc. v. Crum & Forster Ins. Cos.*, 682 F.2d 660, 663–64 (7th Cir.1982); Bork, The Antitrust Paradox: A Policy at War with Itself (1978). Whether or not the Commission must use that concept of competition in its field of regulation, cf. *Federal Maritime Comm'n v. Aktiebolaget Svenska Amerika Linien*, 390 U.S. 238, 244, 88 S.Ct. 1005, 1009, 19 L.Ed.2d 1071 (1968), it can hardly be criticized for doing so. The Commission could have explained more clearly than it did what competitive standard it was applying in this case, but its other recent pronouncements, e.g., *Railroad Consolidation Procedures, General Policy Statement*, 363 I.C.C. 241, 245 (1980), indicate that nowadays it views competition much as an antitrust analyst does.

■ The first-order effect of closing through routes is on the relative incomes of the connecting carriers rather than on the

competitive process as we have defined it. The shipper in our hypothetical example has an alternative through route that costs him no more than the joint rate that has been cancelled, because joint rates on alternative routes are identical. True, his choices have been narrowed; and it might appear that for a regulated firm to reduce consumer choice is the antithesis of competition. However, one of the criticisms of regulation in general and railroad regulation in particular is that it forces the regulated firms to provide uneconomical services; and as with abandonments, so with through routes, the fact that a railroad discontinues a particular service offering is not necessarily a sign of diminished competition from a broad consumer-welfare standpoint. Although a shipper might in theory prefer one through route to another—maybe one is faster, and that was the one that has been "closed"—in practice routing is almost always determined by the originating carrier rather than by the shipper. Time-sensitive shipments are rarely made by train; if the shipper wants speedy delivery he uses another mode. So it is usually a matter of relative indifference to him whether his shipment travels on a direct or circuitous, a rapid or a leisurely, route, provided there is no price difference. As in our hypothetical example, the cancellations challenged in this case do not close any through routes for which a shipper has no alternative through route. That may be why, although thousands of shippers are affected by Conrail's mass cancellation of joint rates, only one shipper group (the paper industry's trade association) is a petitioner in this court.

■ Nor does the adverse effect of these cancellations on the incomes of connecting railroads show that Conrail is out to monopolize the northeastern rail industry. Only three connecting lines are petitioners in this court. One (MoPac) is a subsidiary of the large and profitable Union Pacific system, and the two others are, in their words, "profitable" subsidiaries of the Canadian National Railways. Conrail is a bankrupt, living on the federal dole. We cannot believe, and certainly the Commission was not required to believe, that Conrail is engaged in a predatory scheme—which would be quixotic in its circumstances—to deprive competing lines of the financial resources they need to compete effectively and, having broken them, to charge shippers monopoly rates.

■ But that is not the end of the case. If the closed routes are more efficient— shorter, less crowded, better maintained, having fewer interchanges—than the routes that remained open after Conrail's joint-rate cancellations, the cancellations may cause a decline in the quality of service (rail shippers are not entirely indifferent to the time it takes to deliver their shipments), and may cause higher costs that in the long run could lead to higher rail rates or greater taxpayer subsidies for Conrail. Even if the nominal rates did not rise, they would be higher on a quality-adjusted basis. We need not enumerate the regulatory distortions that might make the closing of efficient through routes profitable conduct for Conrail, when in an unregulated market it would be commercial suicide. Apparently such closings occur. See, e.g., *Missouri-Kansas-Texas R.R. v. United States,* 632 F.2d 392, 405 (5th Cir.1980). If the closed routes that are cancelled are more efficient than the alternative routes that remain open, the cancellations are not in the public interest.

■ That brings us at last to the heart of this case—the controversy over the study that Conrail placed in evidence to carry its burden of proving that the cancellations were consistent with the public interest, by demonstrating that they would increase efficiency. The Commission relied very heavily on the study, as it was entitled to do if the study was reliable, since as we have said the cancellations could pose a serious danger to competition or to shipper welfare— which the Commission is entitled to and apparently does regard as synonymous— only if the closed routes are more efficient than the open ones. But if they are, then the cancellations would undermine the railroad industry's competitive performance, at least if competition is conceived not as ri-

valry per se but as the allocation of resources that best serves consumer needs.

Conrail's study found that diverting traffic from the closed to the open routes would reduce average length of haul ("circuitry"), reduce average transit time (by 1.2 days), reduce fuel consumption (by 2 million gallons of oil a year), reduce the number of interchanges, improve railroad car utilization, and, not incidentally, increase Conrail's revenues by $50 million a year. Not all of these considerations relate to efficiency and there is some double counting of those that do. Conrail's increased revenue is not an efficiency gain but just a transfer of wealth to it from connecting carriers. Reducing the number of interchanges and reducing the average length of haul have no economic significance in themselves, though both might reduce average transit time, which would be a benefit to shippers and hence a genuine efficiency gain. Reducing the average length of haul should reduce railroad costs, but since those costs include the cost of fuel there is double counting if reduced circuitry and reduced fuel consumption are treated as separate benefits.

 Since the statute requires the Commission to consider distance, time, expense, fuel consumption, and shipper welfare separately, Conrail and the Commission cannot be criticized for the emphasis they place on all those factors, redundant as they largely are. And if the conclusions in Conrail's study are credible, then even though the study does not integrate those conclusions into a consistent measure of the efficiency gains from the cancellations it would be evidence enough to support the Commission's conclusion that the cancellations are in the public interest, since there is no competitive or other dimension of the public interest at risk in this case besides the interest in not closing a more efficient route in favor of a less efficient one. The petitioners make a number of criticisms of the study, however, and though some are picayune and were adequately discussed by the Commission, several are serious—including the criticism that the study, limited as it is to traffic for which Conrail is the

terminating carrier, contains no information about traffic for which Conrail is either the originating or an intermediate carrier. It is true that more than half of all the traffic affected by the cancelled joint rates is included in the study, and it may seem obvious that if the closed routes are less efficient than the open ones on eastbound traffic they must be less efficient on westbound traffic. But the fact that two through routes, one running from a western origin to an eastern destination, the other from an eastern origin to a western destination, both go through Chicago does not make them identical. Their termini may be different; and the alternative route—the open route—may be shorter for the west-east through route and longer for the east-west one. Conrail could easily have dispelled doubts on this score by including some east-west through routes in its study. Its only stated reason for not doing so (besides the incorrect assertion that any two through routes running in an opposite direction through the same gateway must be identical) is that it does not know the transit time of shipments that it does not terminate. But it could have used the Commission's discovery processes to find out.

Another serious problem is the grossly aggregative form in which the study results were presented to the Commission. Conrail cancelled thousands of joint rates—how many, we are not told. Each is for a different through route. To do the study Conrail first had to calculate for each of the through rates the length of haul, the transit time, the number of interchanges, the number of cars used, and the fuel consumption; then had to match each route with an alternative route or routes that remained open and to which traffic on the closed route could be expected to switch; then had to calculate the length of haul, transit time, etc. for the alternative route or routes. The summation of these comparisons is the study results—the 1.2 day average reduction in transit time, etc.

So far as we can tell—and we are handicapped by the parties' failure to place the complete study in the record filed in this

court—what was submitted to the Commission was just the summary of results. If so, then even if the study was 100 percent accurate all the Commission could learn from it was that the many thousands of through routes that Conrail was closing were less efficient in the aggregate than the many thousands of alternative through routes that would remain open. It could still be that a large fraction of the closures represented reductions rather than increases in efficiency. Suppose Conrail had closed just two through routes, their transit times were 10 and 20 days respectively, and the transit times of the alternative through routes that remained open were 14 and 13.6 days respectively. Then although the average transit time of the closed routes would be 1.2 days longer than the average transit time of the open routes, only one of the closings would have increased efficiency; the other would have reduced it.

■ If a large fraction of the Conrail cancellations (one half, in our example) in fact reduced rather than increased efficiency, the Commission was not acting in the public interest in approving them all; and nothing in the record before us excludes the possibility that just such a meat-ax approach was taken. We are not told how Conrail picked the thousands of joint rates it cancelled but presumably it picked the ones on which its divisions were lower than on some alternative route. We would have to know more about the divisions process to be able to assume without evidence that there is a high correlation between efficiency and a high Conrail division.

■ To all this it may be replied that, deficient as it may have been, Conrail's massive study was probative enough to satisfy Conrail's burden of production and therefore shift to the petitioners the burden of producing enough evidence of their own to shake the Commission's confidence in the study. But this argument treats ICC proceedings as if they were purely adversary contests. They are not supposed to be; the Commission is supposed to protect the public interest, not just umpire disputes. Shippers adversely affected only in the long run

by the joint-rate cancellations might not have the resources or the incentives to challenge Conrail's massive computer study, especially when that study was submitted in so summary a form as to discourage challenge. Moreover, the main problem with Conrail's study—a problem that facile burden shifting cannot cure—is not the amount of evidence in it but the uninformative manner of presentation. Since the study was built up from individual through-route comparisons, Conrail easily could have presented the data underlying those comparisons along with the summary statistics. The burden of production would not have been greater; there would have been no more evidence; it just would have been presented in a way that enabled evaluation. The Commission did not even require Conrail to make the underlying computer tapes and programs available to the petitioners until seven days before their rebuttal evidence was due. This was not enough time to allow them to search for flaws in the assumptions or computations underlying the study. It is routine practice in lawsuits in which computer studies are used as evidence to give the opponent's computer experts access to the tapes and programs well in advance of trial; the failure to give the petitioners reasonable access in a case of this magnitude is inexplicable. Cf. *United States v. Dioguardi,* 428 F.2d 1033, 1038 (2d Cir.1970).

■ Because of the deficiencies in Conrail's study, which provided the essential factual basis for the Commission's decision approving the joint-rate cancellations, the decision must be set aside as unsupported by substantial evidence, cf. *Green Bay & W.R.R. v. United States,* 644 F.2d 1217, 1228–30 (7th Cir.1981); *Aberdeen & Rockfish R.R. v. United States,* 270 F.Supp. 695, 706–13 (E.D.La.1967) (3-judge court), and the case returned to the Commission for a further hearing on the adequacy of Conrail's study. The Commission should require Conrail to present evidence on the impact of the cancellations on Conrail outbound traffic, to submit additional evidence (if Conrail has not done so already, which

we cannot tell because the record before us contains only a brief excerpt from the study) on the relative efficiency of the individual closed and open through routes as distinct from the relative efficiency of the closed and open routes in the aggregate, and to give the petitioners a reasonable opportunity to analyze the computer tapes and programs underlying the study.

VACATED AND REMANDED.